CHARLES JONES v. STATE OF MISSISSIPPI.

[52 South. 791.]

1. CRIMINAL LAW AND PROCEDURE. *Murder. Insanity. Evidence. Exclusion of part for insufficiency of whole.*

Where in a murder case an issue was presented as to defendant's insanity and both sides introduced testimony thereon, it was error at the close of the evidence to exclude all testimony introduced by defendant on that subject, leaving that introduced by the state including the fact that defendant had previously killed three men, to the consideration of the jury, even where all the evidence on the subject might have been rightfully excluded.

2. SAME. *Constitutional law. Constitution* 1890, *sec.* 26. *Impartial
    jury. Prejudgment never harmless error.*

    Under Constitution 1890, sec. 26, guaranteeing the accused in crim-
    inal proceedings a trial by an impartial jury, a conviction
    should be set aside where one of the jurors prejudged the case
    against the accused and the fact was unknown to the accused
    and his counsel until after verdict and was not disclosed on the
    *voir dire* examination of the juror; and a failure by the trial
    court to grant a new trial in such case cannot be harmless error.

FROM the circuit court of Bolivar county.

HON. JAMES M. CASHIN, Judge.

Jones, appellant, was indicted and tried for and convicted of
murder, and appealed to the supreme court. The facts are
sufficiently stated in the opinion of the court.

*Henry, Fox & Canizaro,* and *Alexander Y. Scott,* for appel-
lant.

*Earl Brewer* and *George Butler,* assistant attorney-general, for
appellee.

[The reporter was unable to find the briefs of counsel in this
case, hence synopses of them are not given.]

Argued orally by *P. Henry* and *A. Y. Scott,* for appellant,
and by *George Butler,* assistant attorney-general, for appellee.

ANDERSON, J., delivered the opinion of the court.

The appellant was tried and convicted of murder, and sen-
tenced to the penitentiary for life. His defense was insanity.
On that question much testimony was introduced, both on the
part of defendant and of the state. At the conclusion of the
testimony the court was moved by the state to exclude all the
evidence of insanity which had been offered by the defendant,
which motion the court sustained, leaving in the testimony

offered on behalf of the state to show insanity, part of which was the fact that he had killed three other men before killing the deceased. This action of the court is assigned as error. Taking the testimony for all it proves and tends to prove, there was not sufficient evidence to go to the jury on the question of insanity. It did not tend to show insanity, but, on the contrary, that appellant's state of mind at the time of the killing was caused by anger. Had the court, therefore, excluded all the evidence of insanity offered for both the state and the appellant, there would have been no error in that respect. Failing to do this, there was left before the jury the fact that defendant had killed three other men before killing the deceased. It is hard to conceive a more damaging error. This testimony, ordinarily, would have been clearly incompetent, and was admitted here on the issue of insanity alone, and was permitted to remain before the jury, when the only reason for its admission had ceased to exist.

Another error assigned is that the court refused to grant the appellant a new trial because of the prejudice and bias of the juror T. B. Johnson. On his *voir dire* examination the court held, and properly so, that Johnson was a competent juror. However, on the motion for a new trial, testimony was introduced to show his incompetency, as follows (it will be borne in mind that there had been a previous trial of this case) :

"J. R. Henderson, white, testified on motion for new trial: That he was in the general mercantile business at Shelby, and knew T. B. Johnson; that he had known him for five or six years, and that Johnson had worked for him, and was in his employ 'last May just subsequent to that time;' that he had heard Johnson express an opinion in regard to Charlie Jones' case 'very often,' and 'it was commented on a good many times;' and that Johnson said 'it would be hard for him to get out of the case without a conviction, owing to his former way; he had

known him a long time, and his former record connected with this case, as he had heard it talked about, he would think he ought to be convicted.' Witness said that Johnson said he had known him [Charlie Jones] 'quite well since he was a young man, and was familiar with his past record;' that he (Johnson) connected Jones' past record with this case, and said, 'On both together it will be hard for him to get out of this case; his record was so bad before that.' These conversations with Johnson were had after the 15th day of May. On cross-examination, Mr. Henderson said that they were simply discussing the Jones case after it had been tried (meaning the first trial), and that, taking his past record, he was surprised he wasn't convicted. He further stated that Johnson was a man of splendid integrity and veracity. He said that Johnson's statements were made in his store; doesn't remember any one being present, except on one occasion a negro.

"L. W. Gordon, white, on motion for a new trial, testified that he lived at Shelby, and that his occupation was a plantation manager; that he knew T. B. Johnson 'last May,' and had known him about four years; that the last trial of Charlie Jones was in 'May; that he had a conversation with Johnson relative to the trial. Q. State what it was, Mr. Gordon. A. Right after the trial, along about that time, there was a discussion over the trial and everything, and Mr. Johnson made a remark that they ought never to have turned him loose; that if he had been one of the jurors he never would have turned him loose; in other words, that he would have hung him. That is the words Johnson used in my presence in front of McKee & Henderson's store. Q. That was after the first trial? A. That was after the trial in the spring before this trial. On cross-examination, he said he couldn't say who was present; he doesn't think any one was; 'but I have heard him repeatedly, several times, make the same assertion.' Q. And he said, if he had been on the jury, he

would have convicted him? A. Yes, sir. He said he had also known Mr. Johnson about four years, and that he was a man of honor and veracity.

"J. C. Lauderdale, white, testified on motion for new trial: Stated that he had lived at Shelby, knew T. B. Johnson, and had a conversation with him after the first trial of Jones. Q. Did you have any discussions about the case? A. Yes, sir; we talked about it several times. Q. State, Mr. Lauderdale, what Johnson said to you with regard to the case. A. He just stated he ought to have been convicted. He didn't see how the jury ever made a mistrial of it; that he thought he ought to have been convicted on general principles, as well as anything else. Q. Did you have more than one conversation with him? A. We talked about it several times; yes, sir. It was generally talked there. Q. That was his expression to you on several occasions? A. Yes, sir. On cross-examination witness said that they were simply discussing the Jones case, and Johnson told him what he had heard of it, and from what he had heard he would convict him; that he had known Johnson about twenty-five years, and had known him to be an honorable man of unquestioned veracity.

"Andrew Agnew, white, testified on motion for new trial, that he was one of the jurors on the first trial, and that he knew T. B. Johnson; that he had a conversation with T. B. Johnson after the first trial of this case. He says: When I passed the store, he (Johnson) asked me how it came off, and I told him they couldn't agree, and he said, 'Why, he ought to have been convicted on his past record.' Q. He knew you were a juror in the case? A. Yes, sir. On cross-examination witness stated that he didn't remember how long after the trial the conversation was had with Johnson, but a very short time, possibly the same evening; that it was in front of Mr. Henderson's store, and several gentlemen were present. Q. You were one of the

fellows who hung the jury and prevented a verdict in this case before? A. I expect I was; yes, sir. Q. Who was present at the time (at the time Johnson made the statement)? A. Mr. Boatright was standing there. Q. Who else? A. Several others; I didn't pay any attention to them.

"F. G. Boatwright, white, testified on motion for new trial that he lived at Shelby, knew T. B. Johnson, and remembered that the first trial of Charlie Jones took place in May last, and that he had heard a conversation between Mr. Johnson and Mr. Agnew [the last-named witness on motion for new trial], who was a former juror in this case. Q. State when that was, and what you heard Mr. Johnson say. A. I don't remember exactly the date; but a few days, as well as I remember it, after Mr. Agnew came along, and was talking to Mr. T. B. Johnson in front of Mr. Henderson's store, and he said, 'Well you all played the devil, Agnew,' and Mr. Agnew said, 'How is that?' Mr. Johnson said, 'You let a man loose that ought to have been convicted long ago on his past record.' Q. Did you ever have any other conversation with Mr. Johnson? A. Yes, sir; I did afterwards. Q. What did he say? A. He said to me individually—he said, 'What do you think about that?' That was when they hung the jury in the Jones case. I remarked to Mr. Johnson that I just thought Jones was thirty days too late in doing what he ought to have done, and Johnson said, 'Well, he ought to have been convicted on his past record.' On cross-examination he said that he expressed an opinion favorable to Jones, and said he would have done it thirty days before Jones did. Q. And Mr. Johnson said, from what he had heard of it, and on his general reputation, he would have convicted him? A. He didn't say from what he had heard of it; he said he would have convicted him on his past record. The witness further stated that he heard the conversation between Mr. Agnew and Mr. Johnson; that they were talking, and he walked

up; that he didn't know what was said before he got there, and heard Mr. Johnson say, 'You all played the devil, didn't you?' to Mr. Agnew, and Mr. Agnew said, 'How is that?' and he said, 'You let a man loose that ought to have been convicted long ago on his past record.'  Q. What did Agnew say?  A. Agnew said: 'Well, he wasn't trying Jones on his past record.  We were trying him on what he has done now.'  The witness further stated that he was present and heard the facts as he stated them; that he had known Mr. Johnson since he (witness) was a little boy; and that he was a man of honesty and integrity.

"J. S. Martom, witness, testified on motion for new trial that he lived in Shelby; that he knew T. B. Johnson, and remembered when Charlie Jones was tried for murder the first time; that he heard Johnson discussing the case after the first trial; that there was a big crowd standing in front of Henderson's store discussing it; that Johnson was talking, 'but not to me,' and I heard him state several times 'that he ought to have been convicted, and he couldn't see why he wasn't convicted, taking his past record with this case he is being tried for now.'  On cross-examination he stated that this was a general conversation on the street; that he does not remember who was present; that he had known Johnson since 1882; that he is a man of good character and unquestioned veracity.  He was asked if he had ever been convicted of anything, and he said that he had, but didn't know what it was he was convicted for, and no further inquiry was made of that fact."

This was all of the testimony for defendant on motion for new trial.  The state introduced five witnesses, including the juror Johnson, on motion for a new trial.  The others than Johnson testified they had known the juror Johnson for a number of years, and his reputation for truth and veracity and honesty and fair dealing in the community was good.  Johnson, in response to questions as to what expression of opinion he had

given to the various witnesses for the appellant on the motion for a new trial, testified: "Well, I don't know. I spoke of Charlie (meaning the appellant) in the past as being unfortunate, and if it was connected with this case it was going very hard with him; but for saying that I would hang him if I was on the jury, that never entered my mind, sir."

This response is no sort of denial, on a fair construction of the testimony of the witnesses as set out above. We cannot sustain this verdict, participated in by this juror. He had prejudged the case. He was biased. He had complained that the appellant was not convicted on the first trial. He stated he ought to have been convicted on general principles, etc. The answers of this juror on his *voir dire* furnished counsel for appellant no sort of reason to believe he had prejudged the case, or that he would do anything else as a juror than try the defendant on the facts and the law, uninfluenced by rumors and his own personal knowledge of defendant's bad record. A trial by a jury, participated in by a juror so fixed in his opinion, and biased and prejudiced, is not a fair and impartial trial under the Constitution and laws of this state. The twenty-sixth section of the Constitution of 1890 guarantees to a person charged with crime a "speedy and public trial *by an impartial jury* of the county where the offense was committed," and legislation encroaching upon the qualifications of jurors to such an extent as to endanger this impartiality would infringe this constitutional privilege. *Logan v. State,* 50 Miss. 269. And surely the courts have as little power in that respect as the legislature.

*Shepprie v. State,* 79 Miss. 740, 31 South. 416, is directly in point. There the juror had qualified on his *voir dire;* but it was shown on the motion for a new trial that he had been told by a witness the facts of the homicide, and had stated to three witnesses that defendant ought to be hung, and the court held that a trial before such a jury infringed defendant's constitu-

tional right to a fair and impartial jury. The defendant is entitled to such a jury, however guilty he may be; and no other tribunal has the power to determine guilt. If there has not been a trial "by an impartial jury," this court must reverse, even though the evidence so overwhelmingly shows the defendant's guilt that such a jury could not have honestly reached any other conclusion. To hold otherwise would amount to this court determining guilt, which it has not the power to do, and which rests alone with a constitutional jury. The trial court had not the power to direct a verdict of guilty, nor has this court any greater power in that respect. The exercise of such power by trial judges, and by this court, would evidence the end in this state of the constitutional guaranty of trial by "an impartial jury." There is no such thing in our law as "harmless error," when the Constitution is violated in the commission of such error.

*Reversed and remanded.*

SMITH, J., delivered the following dissenting opinion.

I am unable to agree with my Brethren in the reversal of the judgment entered in the court below, for the reason that appellant was not prejudiced by either of the errors which my Brethren say were committed in the court below. His only defense was insanity. If sane, he was guilty of murder. When this defense failed, and the court excluded it from the jury's consideration, there was only one verdict which the jury could render, or, to be more accurate, which it had the right to render. and that was a verdict of guilty. If there had been any evidence before the jury at all from which under the law it could have reached a different verdict, or if it had not imposed the punishment of life imprisonment, instead of permitting the defendant to be hanged, a different case would be presented, and the errors, if in fact such they were (as to which I express no opinion), might have been prejudicial.