### ARTHUR MARTIN *v.* STATE.

[54 South. 148.]

1. CRIMINAL LAW. *Misconduct of juror. Impeachment of juror. Bias. New trial.*

On a motion for a new trial by accused on the ground of bias of one of the jurors, testimony by another juror that the juror attempted, to be impeached, was for conviction, throughout the trial, was incompetent.

2. BIAS. *Expression of opinion by juror.*

A juror who stated before the trial that he did not know whether he would hang a white man on a negro's evidence, but from what he had heard, if he was on the jury, he would give accused a life time sentence any way, was disqualified to sit on the jury in a trial of accused for murder and in the absence of knowledge by the defendant or his counsel of the bias of such juror, his serving as a juror was reversible error.

3. SAME.  *Impartial jury.*

    Where there has not been a trial by an impartial jury the court will reverse the case even though the evidence so overwhelmingly shows the defendant's guilt as that such a jury could not have honestly reached any other conclusion than that of guilt.

APPEAL from the circuit court of Quitman county. Hon. SAM C. COOK, Judge.

    Arthur Martin was convicted of murder and appeals.

    The facts are sufficiently stated in the opinion of the court.

*Brewer & Watkins,* for appellant.

    The right to a trial by an impartial jury when being prosecuted for crime is secured by section twenty-six of the Constitution. No more sacred duty can devolve on any court than the duty of seeing to it that this provision of the Constitution receives a strict enforcement. In the light of this record we are overwhelmed by the fact that Martin did not get that trial by an impartial jury that was secured to him by the Constitution. We believe this statement incontrovertible, because in either aspect of the case the defendant was tried by a juror who, to say the least of it, was prejudiced against him. We say in either "aspect," because this ground of the motion appears in a two-fold light. In the first place, if the court be of the opinion that the matters and facts sworn to by the witnesses Johnson and Buckner constitute an expression of opinion prejudicing the case, and the juror failed to disclose such matters on his *voir dire* examination, then a fair and impartial jury did not try Arthur Martin. In the second place, if the court be of the opinion that the matters and facts testified to by the witnesses Johnson and Buckner did not constitute an expression of opinion prejudicing the case, but merely constituted a hypothetical or qualified opinion, then we say that the failure of the juror to give some notice or knowledge of his mental attitude to the appellant, highly

prejudiced appellant's case, because he had not exhausted his peremptory challenge (the record shows appellant to have exhausted nine of his peremptory challenges.), and if such matters had been given to his knowledge he could and would have thereby become entitled to challenge peremptorily the juror, J. M. Madison. Every defendant is entitled as a matter of right and of law to know the mental attitude of jurors serving in his case, and to have each and every one of them absolutely fair and impartial as between him and state on whatever issue joined.

The first proposition, as set out above and sustained by the record in this case, as settled beyond all doubt in this state by the decisions of this court cited below: *Nelms* v. *State,* 13 S. & M. (Miss.) 500; *Sam* v. *State,* 13 S. & M. (Miss.) 189; *Cotton* v. *State,* 31 Miss. 504; *Jeffries* v. *State,* 74 Miss. 675; *Sheppric* v. *State,* 79 Miss. 740; *Dennis* v. *State,* 91 Miss. 221; *Jones* v. *State,* 52 South. Rep. (Miss.) 791.

The second proposition: "That Johnson's and Buckner's testimony as to what was said to them by the juror Madison merely constituted a hypothetical or qualified opinion" we now wish to argue.

On this branch of the case we cite the court to the following Mississippi decisions: *Cannon* v. *State,* 57 Miss. 147; *Schrader* v. *State,* 84 Miss. 593; *Cody* v. *State,* Third Howard 27.

*P. H. Lowery,* for appellant.

On the motion for a new trial it was shown by the testimony of the witnesses, Johnson and Buckner, that one of the jurors who tried this case, viz.: J. M. Madison, had formed and expressed an opinion adverse to this defendant, and had even gone so far as to discuss what he would do if put upon the jury. This testimony is absolutely uncontradicted. It is also shown by the testimony of Mr. Peden that this juror was not only

adverse to the defendant, but that he denounced the instructions of the court and expressly declined to consider them, or to consider the defendant's evidence. It is also shown by the testimony of this witness and by the testimony of Mr. Covington, and by the registration books, that this juror was about seventy-eight years old, and cannot read and write. While the age of the juror does not render him incompetent and his inability to read and write could not ordinarily be taken advantage of after a verdict, yet they shed more light upon the purpose of this juror. He was not only a volunteer upon the jury by failing to claim his exemption from age, but in order to get upon the jury, had falsely stated that he could read and write and also that he had no opinion as to the guilt or innocence of the defendant. That he had not even heard any expression of opinion by any one else and knew absolutely nothing about it.

Even if the trial had otherwise been absolutely free from error, and even if there had been no evidence which would justify the acquittal of this defendant, this error alone would entitle him to a new trial. How much more is this the case where a man is forced to trial against adverse sentiment and where the evidence largely preponderates in favor of his innocence and where the record abounds in errors against him in the progress of the trial. *Jones* v. *State,* 52 So. 791; *Sheppric* v. *State,* 79 Miss. 740; *Jeffries* v. *State,* 74 Miss. 675; *Sam* v. *State,* 31 Miss. 480; *Cotton* v. *State,* 31 Miss. 504; *Nelms* v. *State,* 13 S. & M. 500; *Cody* v. *State,* 3d Howard 27.

It may be in this case that if the juror, Madison, had disclosed that which was shown by the testimony on the motion for a new trial, the court, might after hearing the facts have decided him competent but that is not the question. The impression or opinion which he had formed makes him *prima facie* incompetent and only the judgment of the court, after hearing all of the facts, makes him competent, and even then the defendant with

all the lights before him would, in all probability, have challenged him.

*Jas. R. McDowell,* assistant attorney-general, for appellee.

Coming now to the only serious point in the whole case, I will discuss the juror, Madison. He was evidently an old man, but his faculties seem to have been active. Counsel attempts to show that he could neither read nor write, but this, of course, comes too late after verdict. If he was too old to sit on the jury then counsel ought to have objected to him for that reason, or should have shown that his faculties were impaired. These objections are frivolous; but there is a more serious phase. This witness' *voir dire* examination appears on pages 54, 55 and 63 of the record. He is shown there to be qualified to try the case. On a motion for a new trial testimony is introduced to show that he had expressed an opinion as to the defendant's guilt. I think, however, the record will disclose the fact that this witness stated a hypothetical case, and did not announce it as his fixed opinion that this defendant was guilty. He simply says that if what he heard is true that he ought to be hung.

Of course, I realize the force of the many cases which have held, that the formation or expression of an opinion antagonistic to the defendant on trial on such a charge, and will not take issue with counsel for defendant on this point. The Jeffries and Sheppric cases, and similar cases, have settled the law on that point.

In *Jones* v. *State,* 52 So. 791, where the court held that the jury was prejudiced, Smith, J., in a dissenting opinion says, that where the only defense was the insanity of the defendant, and if this defense failed and the jury could have rendered no verdict except that of guilt, reversals because of the expression of an opinion by a juror, should not be granted. It strikes me that that case and the instant case are somewhat parallel in this. Whereas, the only defense was an alibi, and if that should

fail, then defendant is guilty of a cold-blooded assassination, and where this juror, Madison, has said that if what he had heard was true the defendant ought to be hung, this expression by Madison could have in no wise prejudiced defendant's case.

I realize that the defendant, however guilty, is entitled to a fair and impartial trial before twelve men, who must be ready and willing to give him a fair trial, and must not have prejudged his guilt or innocence, but I submit that on the trial of this case, and on the motion for a new trial, at which time the state had no opportunity to go into the matter, there was not sufficient proof to show that Madison had prejudged the defendant's guilt. I confess that the juror, Madison, should have been more frank with the court, and have given the court the benefit of any conversation he had ever had, no matter whether a hypothetical case or not, but if this was a hypothetical case only, then it seems to me that no harm has come to the defendant. Your honors will have to determine from the testimony on the motion for a new trial, meager though it is, whether the juror, Madison, had really prejudged the case or was merely stating a hypothetical case; and whether or not the juror corruptly concealed his opinion from the court; and whether he went into the box intentionally withholding from the court and counsel his opinion, in order that he might sit on the jury and have a chance to convict the defendant. On this last point, that is, upon the qualification of juror Madison, I will have nothing further to say, but will respectfully submit the matter to the court to determine whether or not, as a matter of fact, Madison had such an opinion as to the guilt or innocence of the defendant as would disqualify him; and whether or not he had in fact prejudged the case against the defendant; and whether or not he willfully and corruptly withheld his opinion from the court for the purpose of having a chance to convict the appellant.

WHITFIELD, C.

Whoever killed the two women was guilty of a deliberate assassination. The defense was an alibi. It may just be said, generally, that if the testimony for the state was believed by the jury, as it evidently was, then the defendant is guilty; but that, if the testimony for the defendant is true, then an alibi was clearly established. There was a conviction and sentence to life imprisonment, and numerous errors are assigned. We shall notice but one error, and that is the assignment that the juror Madison was wholly disqualified from sitting on the jury, and that the defendant did not, therefore, have this case considered by an impartial jury, which the Constitution imperatively requires.

On his *voir dire* the juror, Madison, testified as follows: J. M. Madison, called as a juror, sworn, etc.: "Q. Have you formed or expressed an opinion as to the guilt or innocence of the defendant? A. No, sir. Q. Have you any bias, feeling, or prejudice either way in the case? A. No, sir. Q. Do you know of any reason at all why you could not go into the jury box, and hear the evidence of the witnesses, and render a fair and impartial verdict from the testimony? A. No, sir. Q. Have you any conscientious scruples against the infliction of capital punishment? A. No, sir. Q. What beat do you live in? A. Beat 3. By the court: Have a seat in the jury box. Mr. Madison, have you ever heard it discussed? A. No, sir. Q. You heard any witnesses testify? A. No, sir. Q. Heard anything about what the witnesses say about it? A. No, sir. Q. Have you heard any expression about it from anybody? A. No, sir. Q. Never heard anybody say what they thought about it one way or the other? A. No, sir; not at all. Q. And you have no opinion about it? A. Not a bit in the world. Q. Have you ever heard what the circumstances of the killing was? A. No, sir; I haven't. I just heard of the killing,

but what it was for I don't know.  Q. Well, have you ever heard anything about how they were killed? A. No, sir; did not.  Q. Nothing in connection with it? A. No, sir.  Q. Then you have no opinion about it? A. None at all."

This juror, therefore, on his *voir dire,* fully qualified himself.  He said he had not heard any witnesses talk about it, nor had he heard any expressions about it from anybody, nor had he heard anybody say what they thought about it one way or the other; that he did not have any opinion, not a bit in the world; that he had heard nothing in connection with the case, and had no opinion at all.  On the motion for a new trial, made upon this ground, the following testimony was taken:

### EVIDENCE ON MOTION FOR A NEW TRIAL.

C. E. Johnson, a witness introduced by the defense in support of motion for a new trial, having been first duly sworn by the court, testified as follows, to wit:

"Q. Mr. Johnson, where do you live?  A. I live— well, I couldn't just exactly tell you, about a mile and a quarter, I guess, northwest of Birdie, I think.  Q. Who did you live with?  A. D. S. Hale.  Q. What business are you engaged in?  A. I am farming.  Q. How old are you?  A. I was twenty-two years old last February, I believe.  Q. Where were you raised?  A. I have been raised in the bottom—Delta.  Q. Where—did you get to the bottom; were you born anywhere?  A. No, sir; I was born in Lee county, Mississippi.  Q. Do you know Mr. J. M. Madison, old Mr. Madison?  A. Yes, sir.  Q. How long have you known him?  A. Why, I haven't known him very long, just merely know him when I see him.  Q. Did you see him at any time last fall after Arthur Martin was arrested?  A. Yes, sir. Q. Where did you see him, Mr. Johnson?  A. Well, I seen him between Birdie and Darling, out there on a little railroad, at a log yard out there.  Q. What were

you doing at the time? A. Was hauling logs. Q. Who
for? A. D. S. Hale. I was swamping. Q. Who was
with you? A. J. J. Buckner. Q. When you saw Mr.
Madison, was there any conversation about Arthur Mar-
tin's guilt or innocence, and did he express himself about
it? A. Well, yes, sir. Q. Well, what did he say, whether
or not he knew or heard about it, or had any opinion
about it? Just state what he said. A. Well, he was—
he believed, he said, from what he heard, that he was—
what he heard in the preliminary trial, the magistrate's
court out there at Sledge, that he believed that he was
guilty. Q. Did he claim to have heard the preliminary
trial himself, or heard from it, do you remember? A.
Well, I don't; I believe, well as I remember, that he
heard from it. Q. Well, what else was said? Just
state what was said and how it came up. A. Well, Mr.
Buckner, he was acquainted with him, and he asked Mr.
Madison what did he think about it. Well, he said—he
says: 'If what I have heard is true, why I believe he
ought to be hung for it.' And Mr. Buckner says: 'Well,
Mr. Madison, will you believe, take a negro's testimony,
and there wasn't any eye-witness, and hang a white man
on their evidence?' Q. Well, what did he say about
being on the jury or anything? A. Well, he said, says,
well, says, 'I don't know about that;' says, 'According
to my belief,' and all about it, but says, 'If I was on
the jury,' says, 'I believe I would give him life imprison-
ment anyway.' Q. What did he say about his belief,
as to whether he was guilty or innocent, from what he
heard about it? A. Well, he stated that he believed he
was guilty. Q. Well, did Mr. Buckner express any opin-
ion about it, do you remember, to him? A. Why, I
don't remember whether he did or not. Q. He was
talking to Mr. Buckner? A. Yes, sir.

"By the court: Q. Where did you say you lived? A.
I live northwest of Birdie. Q. You say you were work-
ing for one Mr. Hale? A. Yes, sir; D. S. Hale. Q. The

Mr. Hale, the man that testified here in the case for the
change of venue? A. I don't know, sir. (Mr. Lowrey:
He is the same man.) Q. You say Mr. Madison was a
casual acquaintance of yours; you just knew him by
sight? A. Yes, sir. Q. That all? A. Yes, sir. Q.
How many people did you ever hear express themselves
about this matter? A. Well, I have heard a great many
express their opinion about it. Q. When did it occur
to you, when was this you heard Mr. Madison express
his opinion? A. Well, I don't just remember what
time it was. Q. Well, how long ago? A. It was some-
thing like two or three weeks, maybe, after Mr. Martin
was arrested. Q. Name some of the others you have
heard express themselves about it? A. Well, Mr. What-
ley, J. M. Whatley, at Birdie, I have heard him; but
this was after the trial, and they were just talking about
how bad it was. Q. Now, when did it occur to you that
you had heard Mr. Madison express his opinion about it?
A. Well, I don't remember just what time it was. Q.
When did you learn that Mr. Madison had been on this
jury? A. I haven't—I don't believe I remember; I
haven't heard. Q. Never heard that he was on the jury
that tried Arthur Martin? A. I don't remember; I
don't think I have. Q. Well, how come you here to tell
about this? A. Sir? Q. How came you to be here?
A. I came down here to bring a letter for Mr. G. W.
Sims from Mr. Hale. He was sick. Q. When? A.
To-day. Q. And you were summoned after you got
here? A. Yes, sir. Q. And nobody knew about your
hearing Mr. Madison until you came here? A. Sir? Q.
Nobody knew about you having heard Mr. Madison's
statement about his opinion in this case before you came
down here to-day? A. Well, no one but Mr. Buckner.
Q. Mr. Buckner? A. Yes, sir. Q. What was Mr.
Madison doing over there? A. Why he was going out
to Darling. Q. And he stopped by there? A. Well, he
stopped there a few minutes, and asked the way out to

Darling. Q. Well, I understand you to say, if what he heard about what occurred at the preliminary trial was true, that he thought he ought to be hung? A. Yes, sir. Q. And then he was asked, if he was on the jury, 'would you believe these words of negroes testifying against him, and hang a man for that? A. I didn't understand you. Q. You didn't? A. No, sir. Q. What did you say that Mr. Hale asked him about these negro witnesses? A. It wasn't Mr. Hale; it was Mr. Buckner. Q. What did he ask him about it? A. What did he ask him? Q. Yes. A. Well, he asked him just what he thought about the trial that he had heard. Q. I understood you to try to tell something a while ago about what Mr. Buckner said to him. Did Mr. Buckner say anything to him about these negro witnesses? A. Well, he just asked him if he would take negro's evidence that way and convict a man, or hang a man—I believe that is the way he told it. Q. What did he say, Mr. Madison, in response to that? A. I don't remember just now. Q. Were you here in the court room during the progress of the trial at all? A. No, sir. Q. Now, as I understand, this conversation that you heard between Mr. Madison and Mr. Buckner occurred about three weeks after the killing—alleged killing—of the women? A. Something like that; I disremember how long. Q. Something like that, and didn't recur to you until you were subpoenaed here to-day? A. No, sir. Q. And you came down here upon another mission, to deliver a letter? A. Yes, sir. Q. And you were then subpoenaed? A. Yes, sir.''

Mr. J. J. Buckner, a witness introduced by the defendant on the hearing of a motion for a new trial, having been first duly sworn, testified as follows, to wit:

"Q. Mr. Buckner, where do you live now, and what are you doing? A. I live up here at Mr. Martin's mill, about four and one-half miles from Sledge. Q. What business are you engaged in? A. Driving a log team.

98 Miss.]                    Opinion of the court.

Q. How long have you been living there? A. About
three weeks. Q. You are logging? A. Yes, sir. Q.
Where were you raised, Mr. Buckner? A. I was raised
in Missouri; that's—well, I was born in Iowa, and when
I was about five or six years old my father and mother
moved to Coley Mountain, Missouri, about forty miles
this side of the Iowa line. Q. How long have you been
in Mississippi? A. About seven years. Q. Do you
known Arthur Martin here? A. Yes, sir. Q. How long
have you known him? A. About nine years. Q. How
long have you been in Mississippi? A. About seven.
Q. You knew him before you came here? A. Yes, sir;
I—but I wasn't personally acquainted with him. You
might say I would know him when I would see him. I
come down into the part of the country where they
moved. Q. Did you come down here when they came?
A. Yes, sir; I came down here on the 8th day of June.
I didn't come with them exactly. I come down along
about the same time they came here. Q. You knew him
before you came? A. Yes, sir; I was acquainted. Q.
Did you know Mr. J. M. Madison? A. Yes, sir. Q.
The old gentleman? A. Yes, sir. Q. How long have
you known him? A. Fourteen years, I believe. Q.
Where did you live, Mr. Buckner, when this killing oc-
curred that Arthur Martin is accused of? A. I lived
at Jones' Mill. Q. How far from Mr. Martin's? A.
About eleven miles; something like that. A. Did you
know Mr. Madison then? A. Yes, sir. Q. How far did
Mr. Madison live from Mr. Martin's mill, and where this
killing occurred? A. Well, I couldn't exactly tell you.
I suppose it was about twelve, maybe thirteen, miles;
I don't know. He lived there on Whitning, above there;
in there somewhere. Q. Did you see Mr. Madison along
in the fall any time? A. Yes, sir; I saw him along in
the first days of November. I don't know exactly what
day. Q. Do you remember about how long it was after
this killing? A. No, sir; it must have been three or

four weeks, or maybe a little longer, maybe not quite so long. I couldn't say exactly. Q. Where did you see him? You say what were you doing and what was he doing? A. I was logging up there for Mr. D. S. Hale. I was hauling logs there for Mr. D. S. Hale, and he was hauling for Mr. Sims, and I was down at the lake there unloading the logs, and Mr. Madison come up there to where we were unloading the logs. Q. Well, you know what he was doing. Was he riding or walking? A. He was riding, I think. Q. Who was present when he came up? A. Why, the best of my recollection, I think Charlie Johnson, my swamper. I think Mr. Hale was there. I wouldn't say positive Mr. Hale was there, but I think he was there at the time. I wouldn't say positive, but I think he was. Q. Was there anything said then by him, or to him? Was the killing of these women, or Arthur Martin's guilt or innocence, discussed there? A. Yes, sir; we talked about it; we talked about it. Q. Just tell how it came up, and what was said, to your best recollection. A. Well— Q. Did he say anything about what he thought about it? A. Yes, sir; he said that it was a mighty dirty thing, he thought. He first asked me, he says, 'What you think of that?' I says, 'What do you think of that scrape that Arthur Martin is into up there?' I says, 'Well, from what I have heard, it is a pretty bad affair.' He says, 'Yes, I think it is, too.' He says, 'Well, what do you think they will do with that young man?' 'Well,' I says, 'I don't know,' I says, 'I couldn't tell you,' I says, 'what they will do with him,' I says, 'I don't know, have no idea.' 'Well,' he says, 'I think he needs hanging, from what I have heard.' 'Well,' I says, 'Mr. Madison, would you take a negro's evidence in preference to a white man's and hang a man?' He says, 'Well, I don't know about that; but,' he says, 'from what I have heard,' he says, 'if I was on the jury,' he says, 'I would give him a lifetime sentence anyhow.' Q. Well, did he discuss anything about

·where he heard and where he got this information? A. No, sir; he never did—he never did say who he had talked with, nor nothing about it. Q. Was that after the trial at Sledge? A. Yes, sir. Q. Was there anything said about the trial? A. Yes, sir; yes, he said, from what he had heard, that the evidence that was to come in— I think that's where the trial was, ain't it, at Sledge? Well, that is the one he spoke of. Q. Well, now, is that all, now, that was said, as far as you recall it? A. Well, he asked me, he says, 'How long has it been since you have been about Mr. Martin's?' 'Why,' I says, 'it has been about two years; a little over, I think.' He says, 'Well, ain't you going up there to see him?' I says, 'I don't know whether I will or not.' I says, 'I don't know whether I will go up there or not.' And we walked off there a little while, and that there is about the main part of the discussion that we were talking about. We first got to talking about the logs we were hauling, and then drifted on into that subject, because that was what people generally was talking about up there. Whenever you would see a crowd of men together, why they were generally discussing that Martin trial up there, because they knew I knew Mr. Martin and was acquainted with him.

"By the court: I don't care to ask him anything."

L. P. Peden, a witness introduced by the defendant on motion for a new trial, having been first duly sworn, testified as follows, to wit:

"Q. You were on the jury that tried the Martin case? A. Yes, sir. Q. Arthur Martin here. Mr. J. M. Madison was on the jury I believe? A. Yes, sir. Q. Mr. Peden, throughout the consideration of that trial, was Mr. Madison for conviction or acquittal? A. He was for conviction. Q. From the start? A. Yes, sir. Q. Did you undertake to discuss it with him? A. Yes, sir.

"By the court: The court is very much embarrassed on a matter of this kind, the state not represented. I

think that is a thing that is incompetent; but I will hear what he has to say. My understanding of the rule is no member can impeach his verdict, or impeach the verdict of the jury.

"Q. Was there anything said to him about the fact, the law of the case, and what did he say? A. About the instructions? Q. Anything about that? A. Yes; the instructions, he wouldn't pay no attention to them at all. Q. What did he say about it at all? A. Oh, he says, 'Damn the instructions, that is just gotten up by the lawyers,' he says, 'I never pay no attention to them.' And I tried to argue with him that the judge had accepted him, and what he didn't like about it he marked out or discarded, and had it ordered, and the clerk had filed them, and put his signature to them. Q. Mr. Peden, I will ask you if any threat, or anything of that kind was made against any parties, discussing about what they would do with them if they didn't agree? A. No, sir; I don't know that there was, unless it was in a joking manner, considered so all the way through, I don't; in fact, I don't remember of hearing of any. Q. The jury were out, you remember how long, when they went out and when they came back? A. Yes, sir; they were out in the neighborhood of twenty-eight hours—went out somewhere about two o'clock I reckon, one or two o'clock, somewhere in that neighborhood, and came out then the second evening. Q. There was a pistol introduced in evidence. State whether or not the jury had that with them while they were considering that evidence. A. Yes, sir. Q. Do you know whether Mr. Madison can read and write or not? A. I do not.

"By the court: What was it you said about twenty-eight hours? A. He asked me how long we were in there, and I said some twenty-eight hours, somewhere thereabouts, I never made the calculation. Q. I understand Judge Lowrey asked you how long this expression was made, by Mr. Madison—

"Mr. Lowrey: No; I— Q. You were arguing with Mr. Madison about the case, as I understand? A. Yes, sir; I was wanting him to consider the case. Q. To take the instructions, and take them in, and consider all of the evidence as it had been, and, as jurors do you were maintaining one view of it, and him another view of it, was that it? A. Well, Judge, I can't exactly say that either. Q. Well, Mr. Madison expressed himself for conviction? A. Yes, sir. Q. From the start? A. Yes, sir; right at the start. Q. You were rather inclined for acquittal, were you not? A. Well, no, sir; when I went out of the—

"By the court: I don't care to inquire into it. I want to get at this—

"Witness: If I am allowed to tell it—

"Q. There was a difference of opinion between you and Mr. Madison? A. He wouldn't consider the evidence. Every bit of the state was good. It was just that way, every particle of it; and every bit for the defense was no account. Q. And then you asked him to consider the instructions? A. Yes, sir. Q. And he said 'Damn the instructions,' he didn't pay any attention to the instructions; that they were gotten up by the lawyers? A. Yes, sir.

"By the court: Well, as I said before, I don't think this sort of evidence is competent; but I will hear it all myself."

The court, at the request of defendant, made the following statement:

"On Friday afternoon, while the jury was considering this case, and the court having run out of business at that time, it was the purpose of the court to go home, in Clarksdale, Coahoma county, and remain over until the following Tuesday. The court remained here at Belen until time for the afternoon train, I don't remember what hour, thinking possibly the jury might reach a verdict before it was necessary for me to go to Marks

in order to catch the train for Clarksdale; but the jury had not reached a verdict, and the court then went from Belen to Marks, in Quitman county, with a view of taking the train there for Clarksdale. When he reached Marks, he got a telephone message that the jury had agreed, and returned immediately to Belen, and the jury came in with their verdict, and it was received by the court. When the court adjourned to go to Clarksdale and remain over until the following Tuesday of the third week, the question presented itself to the mind of the court about the propriety of such action on the part of the court from a legal standpoint, I decided I would take no formal adjournment at all, unless the jury agreed before I left the county. Then I left word here with the court officers, if the jury should come to an agreement at any time during the absence of the court from Belen, if they would telephone me, I would come immediately and receive the verdict. These are about the facts.''

"Mr. Lowrey: Do you remember what time the jury went out—how long were they out? I would like to get that in the record.

"By the court: My recollection is that they went out some time about half past one o'clock on Thursday afternoon, and I received notice that they had agreed about six o'clock Friday afternoon.

"Mr. Lowrey: I call your honor's attention to one other matter: That when you started to leave, I, as counsel for Mr. Martin, notified you that I would reserve an exception to your leaving the county.

"By the court: Yes; that is a fact. Counsel for defendant in this county was advised of the fact that the court intended to leave the county and go to Coahoma county, and he then said to the court that he would reserve an exception to that.''

Arthur Martin, a witness in his own behalf, testified as follows, having been sworn:

"Q. You are defendant in this case? A. Yes, sir. Q. Do you know Mr. J. M. Madison? A. No, sir; I just know him when I see him. Q. State whether or not you had any notice or knowledge of any opinion he had about the matter in any way before to-day. A. No, sir.

"Mr. Lowrey: I wish to make a statement that I had no notice or knowledge of the fact that Mr. Madison had any opinion about it, no notice of anything, no more than he stated in his own examination, until after the verdict was rendered in this case, as counsel for the defendant.

"Mr. Lowrey: That is all we have to offer in the way of evidence, if the court please:

"Court overrules the motion for a new trial, and the defendant then and there instantly excepted and still excepts."

We discard, of course, the testimony of the juror Peden. It is true there is no objection made to it, the district attorney not being present; and it is true that the court said he would hear it all, though he did not think it was competent. Manifestly it was not competent, and we shall discard that testimony entirely, and deal with the motion on the testimony of the two witnesses, Johnson and Buckner. The defendant, of course, is not responsible for the absence of the district attorney, and is not to be prejudiced in any way by the fact of his absence.

The learned circuit judge cross-exainmed the witness Johnson fully, but declined to cross-examine the witness Buckner. These two witnesses, Johnson and Buckner, were not impeached in any manner known to the law. No effort was made to discredit them, as was done in the Dennis case, nor was the juror Madison introduced by the state at all, nor did the state offer any evidence whatever on the motion for a new trial. It is perfectly obvious, therefore, that, if what the witnesses Johnson

and Buckner testified to was true, the juror Madison had concealed from the court and the counsel for the defendant his manifest and utter diqualification. Both the defendant and his counsel testified that they had no knowledge of any character of the facts testified to by the witnesses Johnson and Buckner before the verdict was rendered. We are not able to perceive that the testimony of these two witnesses is inherently false. Looking at their testimony as a whole, we cannot say that it shows its falsehood on its face. In this attitude of the matter, we are unable to approve the action of the circuit judge in disbelieving, as he manifestly must have disbelieved, the testimony of these two witnesses. Applying the rules of law, applicable, we think, on this testimony, unimpeached in any way, uncontradicted by the juror Madison himself, delivered by two witnesses, not shown to be of kin to the defendant, not shown to have had any motive for falsifying, and whose testimony on its face does not show it to be inherently false, we are bound to reverse this case, and remand it for a new trial.

The right involved here does not depend upon the erroneous action of the court in merely admitting or excluding evidence, or in giving or refusing instructions, or in any other ordinary matter occurring in the trial of the case. The right involved here is a constitutional right, lying at the very foundation of an impartial jury trial. We know not how better to state the law on this subject, than it has been recently stated by this court, by Anderson, J., in the case of *Jones* v. *State,* 52 South. 791, where he said, for the court: "We cannot sustain this verdict, participated in by this juror. He had prejudged the case. He was biased. He had complained that the appellant was not convicted on the first trial. He stated he ought to have been convicted on general principles, etc. The answers of this juror on his *voir dire* furnished counsel for ap-

pellant no sort of reason to believe he had prejudged the case, or that he would do anything else as a juror than try the defendant on the facts and the law, uninfluenced by rumors and his own personal knowledge of defendant's bad record. A trial by a jury, participated in by a juror so fixed in his opinion, and biased and prejudiced, is not a fair and impartial trial under the Constitution and laws of this state. The twenty-sixth section of the Constitution of 1890 guarantees to a person charged with crime a 'speedy and public trial by an impartial jury of the county where the offense was committed,' and legislation encroaching upon the qualifications of jurors to such an extent as to endanger this impartiality would infringe this constitutional privilege. . . . The defendant is entitled to such a jury, however guilty he may be; and no other tribunal has the power to determine guilt. If there has not been a trial 'by an impartial jury' this court must reverse, even though the evidence so overwhelmingly shows the defendant's guilt that such a jury could not have honestly reached any other conclusion. To hold otherwise would amount to this court determining guilt, which it has not the power to do, and which rests alone with a constitutional jury. The trial court had not the power to direct a verdict of guilty, nor has this court any greater power in that respect. The exercise of such power by trial judges, and by this court, would evidence the end in this state of the constitutional guaranty of trial by 'an impartial jury.' "

It is impossible to state the law any more clearly or forcefully than it is thus stated in this opinion. We add but one further announcement of this court. This court said, in *Ellerbe* v. *State,* 75 Miss. 531, 22 South. 952, 41 L. R. A. 569, speaking of an error fundamental, as is the one here: "If this error were a merely technical one, not vital in its nature, we would not for that alone reverse the judgment. But the error here is one of the

gravest character. It goes to the very organization and constitution of the court trying the appellant on a charge of murder. So far as the lawful power of this court can be exerted in affirming convictions for the violations of the law of the land, it shall be exerted; and mere technical errors, without intrinsic merit, when we can, after a careful and thorough examination of the whole case, confidently say that the right result has been reached, that substantial justice has been done, and that, on a new trial, no other result could reasonably be arrived at, will not avail here for reversal in civil or criminal cases; but where the defendant has been, as here, denied the right secured to him by the Constitution and the laws of the land, in a matter going to the very constitution of the court trying him, we are compelled to reverse the case. In such cases the interests of society, and stability of the laws, the due administration of justice, demand a reversal. Disregard of fundamental right in the case of the guiltiest defendant, his conviction in violation of settled constitutional and legal safeguards intended for the protection of all, are not things which affect the particular defendant in a given case alone, but in their disastrous and far-reaching consequences involve in future trials the innocent and guilty alike, subvert justice, and disorganize society. Guilt should be punished certainly and condignly, most assuredly; but guilt must be manifested in accordance with the law of the land, else some day the innocent, who are sometimes called to answer at the bar of their country, may come to find themselves involved in a common ruin and deprived of the legal trial necessary to the vindication of their innocence.''

The ruling which we make in this case is supported by an unbroken line of decisions by this court as follows: *Nelms* v. *State,* 13 Smedes & M. 500, 53 Am. Dec. 94; *Sam* v. *State,* 13 Smedes & M. 189; *Cotton* v. *State,* 31 Miss. 504; *Jeffries* v. *State,* 74 Miss. 675, 21 South. 526;

*Shepprie* v. *State,* 79 Miss. 740, 31 South. 416; *Dennis* v. *State,* 91 Miss. 221, 44 South. 825; *Jones* v. *State,* 52 South. 791. The *Jeffries case* and the *Jones case, supra,* are not nearly as strong for the defendant as in the case at bar.                    *Reversed and remanded.*

PER CURIAM. The above opinion is adopted as the opinion of the court; and, for the reasons therein indicated, the judgment is reversed, and the cause remanded for a new trial.

<hr />

