# CASES ARGUED AND DECIDED

IN THE

# SUPREME COURT OF MISSISSIPPI

AT THE

# JANUARY SPECIAL TERM, 1879.*

---

## ADELINE CUNNINGHAM v. THE STATE.

1. MURDER. *Insanity. Reasonable doubt.*
    Where the defense to a charge of murder is insanity, if the evidence induces in the minds of the jury the belief that the defence is probably true, they cannot convict.

2. SAME. *Burden of proof. Presumption. Doubt.*
    " Every man is presumed to be sane; and in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered. But whenever the question of sanity is raised and put in issue by such facts proved on either side as engender such doubt, it devolves on the State to remove it, and establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case.

3. SAME. *Degree of insanity.*
    To excuse a crime on the ground of insanity, the degree of insanity must be such as to disqualify the accused for a proper perception of the difference between right and wrong.

4. INSTRUCTIONS. *Conflicting.*
    The giving of conflicting instructions is erroneous.

5. INSANITY. *Delusion.*
    Where the delusion of a party is such that he has a real and firm belief of the existence of a fact which is wholly imaginary, and under that insane belief he has done an act which would be justifiable if such fact existed, he is not responsible for such act.

* The October term, 1878, having failed by reason of the prevalence of the yellow-fever epidemic, this special term was called.

6. SAME. *Mental disease. Uncontrollable impulse.*
  A person is not punishable for an act committed under an uncontrollable im-
  pulse springing from mental disease, existing to so high a degree that for the
  time it overwhelms reason, judgment, and conscience.

7. SAME. *Lesion of the will. Emotional insanity.*
  A person is responsible for an act committed under a mental condition in which
  the mind, perfectly perceiving the true relations of the party, and recognizing
  all the obligations thereby imposed, is unable to control the will.

ERROR to the Circuit Court of Clay County.

Hon. J. M. ARNOLD, Judge.

The case is stated in the opinion of the court.

*Collins & Rasberry,* for the plaintiff in error.

1. There is such a thing as killing a person under an uncon-
trollable impulse, with a deliberate design to effect his death.
This paroxysmal insanity is recognized by our courts. *The
Commonwealth* v. *Rogers,* 7 Metc. 500. A person may know
that the act is wrong when he does it, and yet not be a criminal
in the eyes of the law, owing to such lesion of the will, or to an
insane delusion. *Hadfield's Case,* 27 How. St. Tr. 1281.
Hadfield discharged a loaded pistol at the king, in the theatre.
The pistol was loaded with slugs. When arrested, he said he
knew very well that his life was forfeited, but that he was tired
of life. The evidence tended to show that he labored under
the delusion that it was his duty to offer himself as a sacrifice
for his fellow-men. Lord Kenyon ordered the withdrawal of
the prosecution. We refer the court to the following author-
ities : *Martin's Case,* 71 Anno Reg. 301 ; *Regina* v. *Tyler,*
8 Car. & P. 616 ; *Tonchett's Case,* 1844, in the Central
Criminal Court ; *Bricey's Case,* in same court, 1845. In the
latter case, a servant maid, who had for some time been suffer-
ing under disordered menstruation, cut the throat of her
master's baby, and then rushed into his presence, exclaiming :
" Oh, what will become of me ? I have murdered the dear
baby. Will you, sir, forgive me ? Will God forgive me ? "
No one had ever suspected nor had she ever given any signs
of insanity ; nevertheless, she was discharged on that ground.
*Regina* v. *Vyre,* 3 Fost. & Fin. 247 ; *Roberts's Case,* 3 Ga. 310 ;

*The People* v. *Pine*, 2 Barb. 571; *Regina* v. *Law*, 2 Fost. & Fin. 836; *The State* v. *Windsor*, 5 Harr. 512; *Regina* v. *Bleasdale*, 2 Car. & Kir. 765; *The Commonwealth* v. *Moseler*, 4 Barr, 267; Lewis on Cr. Law, 404; *The People* v. *Sprague*, 2 Park. C. Ct. 43; *Sanchez* v. *The People*, 4 Park. C. Ct. 535; 2 Am. Jour. Ins. 26 (1846); *United States* v. *Hewson*, 7 Boston Law Rep. 361; Stephen's Cr. Law, 91; *Scott* v. *The Commonwealth*, 4 Metc. (Ky.) 227; *Smith* v. *The Commonwealth*, 1 Duv. 224; *Hops* v. *The State*, 31 Ill. 385; *Billman's Case*, 1 Whart. Cr. Law, 30; *The Commonwealth* v. *Shurlock*, Leg. Int. 83 (1857); *The Commonwealth* v. *Smith*, *ib.* 33 (1858); *The Commonwealth* v. *Freath*, 6 Am. Law Reg. 400; *Regina* v. *Haynes*, 1 Fost. & Fin. 666; *The State* v. *Brandon*, 8 Jones, 136.

2. It is enough if the evidence raised a reasonable doubt of the defendant's sanity. *The Commonwealth* v. *Rogers*, 7 Metc. 500; 6 Wend. 227. The presumption of sanity is destroyed when a reasonable doubt is engendered. The instructions required clear proof, and demanded a preponderance of evidence of insanity.

*T. C. Catchings*, Attorney-General, for the State.

1. There was not a particle of evidence indicating insanity at or near the time of the killing, and hence the verdict was right.

2. The charges as to emotional insanity were properly refused. If there be such a thing, it has no application to this case. But, the perception of right and wrong being unimpaired, it is not easy to distinguish in law the meaning of an uncontrollable impulse causing a crime.

3. No proof was made of any insane delusion under which the prisoner was laboring, which made her act seem right to her at the time, and hence a charge on such hypothesis was improper.

4. The charges do not require the prisoner to establish her insanity beyond a reasonable doubt; but the instructions, on the contrary, laid down the law as announced repeatedly in this

State. *Bovard* v. *The State*, 30 Miss. 600 ; *Newcomb* v. *The State*, 37 Miss. 405 ; *Kelly* v. *Little*, 3 Smed. & M. 528. If the charges did, however, require such conclusive proof of insanity to be made by the accused, they would have the countenance of many high authorities, and I think that is the law. 1 Whart. Cr. Law, sect. 55 ; 2 Bishop's Cr. Proc., sects. 670, 672 ; Whart. on Hom., sects. 665, 666 ; 2 Greenl. on Ev., sects. 372, 373.

Sanity is always presumed, and the State, therefore, may rely upon this presumption until it is broken down or overthrown by testimony sufficient to satisfy the jury of the insanity. When this has been done, the burden of overcoming this counter-proof is shifted to the State ; and then, unless the State, by testimony again satisfactory to the jury, establishes sanity, the defendant must be acquitted.

CHALMERS, J., delivered the opinion of the court.

Adeline Cunningham was convicted, in the Circuit Court of Clay County, of the murder of her husband, and sentenced to be hung.

That she committed the deed, and that it was one of peculiar atrocity, is not denied nor gainsaid.

In the dead hour of night, while the husband lay sleeping on the common bed, she split open his head with a hatchet, without provocation or motive, so far as can be ascertained. She waited quietly till morning came, and then freely and voluntarily avowed the act to all inquirers, offering no excuse, save that to one person she stated that her husband was attempting to take her life with a knife, which, she said, would be found in the bed, but which could nowhere be discovered.

The defence set up for her is temporary or periodic insanity, produced by derangement in her monthly menstruations, and which it is said was liable to attack her at each recurring monthly period.

Without desiring to express any opinion on the facts, it is proper to say that there was sufficient evidence to suggest at

least a possibility of the truth of her defence, and to demand that the jury should be left free to determine the question, unembarrassed by erroneous instructions from the court.

They were not so left. By the first instruction given for the State, they were informed that "the legal presumption of sanity is not overcome by the mere probability that the party was insane, but will stand until overthrown by evidence. Mere probability of insanity cannot prevail over the presumption of sanity, so as to work the acquittal of the party on the ground of insanity. For a defence resting on the ground of insanity, the insanity must be clearly proved."

In other words, the jury were told that though they believed the defendant probably insane, she must be convicted on some presumption of law which overthrew all probabilities of fact.

Is this a sound principle of law? Undoubtedly there are numerous authorities which so declare, as there are many also going far beyond this, and holding that the defence of insanity can never avail unless its existence is established to the exclusion of every reasonable doubt. There is perhaps no subject connected with criminal law upon which the authorities are more hopelessly in conflict than the one here presented:—

Three distinct theories are held by courts and text-writers of the highest character, and each may be supported by a long array of respectable authorities, viz. : 1. The prisoner must prove his insanity beyond a reasonable doubt, 2. He must establish it by a preponderance of evidence, 3. He must raise a reasonable doubt as to his sanity,

The first of these views receives most countenance from English adjudications and text-books ; the second is supported by a majority of the American courts ; while the third, though held as yet perhaps by a minority of the adjudged cases, is gaining in favor, is the well-settled law in many of the States, and is supported by a power of reasoning which we deem convincing.

Every indictment charges the commission of a criminal act by a responsible being, and no conviction can occur until the

jury shall have been satisfied beyond all reasonable doubt that such an act has, by such a being, been committed. Sanity is the normal condition of the intellect; so that when the party indicted is seen to be a human being, the presumption of the law (because it is the presumption of common sense) is that the person is sane.

Hence, in the absence of evidence to suggest the contrary, the jury acts on this presumption, and, the deed being proven, the conviction follows. But if, in proving the deed, evidence is offered which suggests a doubt of the party's sanity, the State must promptly meet it, and this without regard to the side from which the proof suggesting the doubt comes. The law clothes the accused with a presumption of innocence which he never loses until a verdict of conviction has been pronounced. He pleads nothing affirmatively, save in rare and exceptional instances, but by his plea of not guilty he puts upon the State the burden of establishing every fact necessary to constitute guilt. The changing phases of the evidence may make his case at various stages wear various aspects. At one moment it may seem that his guilt has been conclusively shown, and at the next it may appear to have been as conclusively negatived; but his own attitude never changes. To every fresh development and every new circumstance he repeats his plea of not guilty, and in every new complication he rests upon his legal presumption of innocence. The testimony offered against him may, indeed, necessitate the production of something on his part to meet the case as made out; but it can never do this until, uncontradicted and unexplained, it has demonstrated his guilt beyond a reasonable doubt. Shall it be said that, because this has been accomplished at some particular stage of the testimony, the burden of proof has shifted, and thenceforward the duty is imposed upon him of reëstablishing his innocence beyond all reasonable doubt? Nobody would venture so to assert, if the demonstration of guilt so made out was in regard to the commission of the act? Why should the rule be different in reference to the mental account-

ability of the defendant? There can be no crime without mental accountability, and it is just as essential to show the conscious mind as the unlawful act. But it is said that the law presumes sanity. So the law presumes malice from the fact of killing; but if any thing in the testimony, either of the State or of the defendant, suggests a reasonable doubt of its existence, nobody ever supposed that the State could stop short of removing this doubt, and of establishing the malice to a moral certainty.

The presumptions or implications which, in criminal cases, the law deduces from the establishment of particular facts, have no other force than to dispense with further proof of the thing presumed, unless something in the testimony, either theretofore or thereafter offered, suggests a doubt of the existence of the presumed fact. But the moment that doubt is engendered in reference to it, if it be as to a fact necessary to conviction, the State must establish the fact independently of the presumption; and the obligation to do this rests continuously upon her. The accused need do nothing save repose upon the presumption of innocence with which the law has clothed him, and claim the benefit of all the doubts which the testimony has evolved.

Apply these principles to the question of sanity. Because he is a human being, the accused is presumed to be sane. He must be sane in order to be guilty. The trial commences with the presumption that he is so. If nothing in the testimony suggests otherwise, there is no obligation to establish it; but the moment the proof warrants a reasonable doubt of it, no matter from which side it comes, that doubt must be removed. Which side must remove it? Manifestly that side which set out to show guilt, because there can be no guilt without sanity. That condition of sanity which is ordinarily the attribute of all men has been rendered doubtful as to this particular man, and, as his guilt depends upon his sanity, its existence must be shown in the same manner, and to the same extent, as any of the other elements which go to make up the crime. What logic or con-

sistency can there be in saying that all the other elements must be established beyond a reasonable doubt, but that this one — certainly as essential as any other — may be assumed on less satisfactory proof? True, the case started with the theory that it existed, but can this in anywise affect the condition in which it must be left at the close, if it has during the progress of the trial been rendered doubtful? How can a jury say, We have no doubt of the guilt of the prisoner, but we do doubt whether he was sane? If a jury in a capital case should bring in such a verdict, would it not be judicial murder to inflict a sentence of death? And yet many such verdicts are practically inevitable under a theory of the law which holds that the burden of proving insanity rests upon the accused, and that he must be convicted unless he has clearly proved it beyond all probability, or beyond all reasonable doubt.

We think the true rule is this : Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered ; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case. *Pollard* v. *The State*, 53 Miss. 410 ; *The People* v. *McCann*, 16 N. Y. 58 ; *The State* v. *Bartlett*, 43 N. H. 224 ; *The State* v. *Crawford*, 11 Kan. 32 ; *Polk* v. *The State*, 19 Ind. 170 ; *Hopps* v. *The State*, 31 Ill. 385 ; *Ogletree* v. *The State*, 28 Ala. (N. S.) 701.

When we speak of insanity as an excuse for crime, we refer, of course, to such degree of insanity as disqualifies from a proper perception of the difference between right and wrong, and thereby shields its victim from legal accountability for his acts. *Bovard's Case*, 30 Miss. 600.

We find in the record, among the instructions asked by the defendant, one numbered twelve, in which the rule here laid down is announced, to wit, that the jury must acquit if they

entertain a reasonable doubt of the sanity of the accused. This instruction is neither marked " given " nor " refused," and we have no means of discovering what was the action of the court upon it. If it was refused, such refusal was erroneous, because it correctly enunciated the law. If it was given, it was in direct conflict with the fifth instruction for the State, upon which we have been commenting, and the giving of conflicting instructions is erroneous.

The ninth instruction asked by the defendant, and refused by the court, was in these words : " Where the delusion of a party is such that he has a real and firm belief of the existence of a fact which is wholly imaginary, and under that insane belief he has done an act which would be justifiable if such fact existed, he is not responsible for such act. Nor is a party responsible for an act done under an uncontrollable impulse which is the result of mental disease."

The doctrine announced in the first clause of this instruction first found distinct utterance in the celebrated prosecution of Hadfield for the attempted assassination of King George III. (20 How. St. Tr. 1281), and owes its birth and adoption into the English law to the genius and eloquence of Erskine. It has been repeatedly since recognized, both in England and America, notably in this country in *The Commonwealth* v. *Rogers*, 7 Metc, 500, and in *Roberts* v. *The State*, 3 Ga. 310. Of its correctness there can, we think, be no doubt. Indeed, though it has by some courts been denied recognition, it seems to us only another method of stating that there can be no crime where there is a mental incapacity to distinguish between right and wrong ; for, though delusions as to particular matters frequently exist in minds which are perfectly rational upon all other subjects, yet, if the delusion be so fixed and vivid as to make the imaginary seem the real, there must be upon that subject a total incapacity to distinguish between right and wrong, since, the entire relation between the victim of the delusion and its unconscious subject being mentally perverted, there can be no proper standard of right and wrong in the

diseased mind. That which to the rest of the world seems right is to him the most flagrant wrong, and *vice versa*. If to his deluded imagination his best friend, or the wife of his bosom, seems a relentless foe, bent upon his destruction, he necessarily acts upon the hallucination which possesses him ; and if his action is such as would be justifiable or proper if the reality was as he supposes it to be, there can be no accountability, because there has been no conscious crime.

If a crazed enthusiast violates the law, impelled by a madness which makes him deem it the inspired act of God, he has only done that which his diseased and deluded imagination taught him was right ; and if the act would be proper in one so divinely inspired, and was the direct and necessary consequence of the delusion, there can be no punishment, because, however rational on other subjects, he was on that subject incapable of having a criminal intent.

The juries must, under the instructing guidance of the courts, be the judges of the sincerity and firmness of the belief, and of whether the act was in truth the direct and necessary result of the insane delusion. There is but little danger that the sober common sense of mankind will be deceived by a feigned madness, or will fail to detect the craftiest impostor who, under the guise of insanity, violates the criminal law. The danger rather is, that indignation at the crime, and incapacity to appreciate the delusion, will make them incredulous of its existence.

We think that the first clause of the instruction, which is taken substantially from the opinion of Chief Justice Shaw in *The Commonwealth* v. *Rogers, supra*, announces a correct principle of law.

The second clause declares that there is no responsibility for " an act committed under the uncontrollable impulse resulting from mental disease." If the impulse meant is the direct result of such mental disease as destroys the perception of right and wrong, this is only a reaffirmation of the

doctrine announced in several preceding charges, and it derives no additional strength from the prefix of the word "uncontrollable." But there is said to be an uncontrollable impulse springing from a mental condition quite different from this, — a state of the mind which perfectly perceives the true relations of the party, and recognizes all the obligations therby imposed, but which, it is said, is unable to control the will.

This character of insanity is variously styled moral, or emotional, or impulsive, or paroxysmal insanity. It is known among medical writers as lesion of the will. Its peculiarity is said to be that, while the mental perception is unimpaired, the mind is powerless to control the will; that while its unhappy subject knows the right, and desires to pursue it, some mysterious and uncontrollable impulse compels him to commit the wrong. This kind of insanity, if insanity it can be called, though sometimes recognized by respectable courts, and still oftener, perhaps, by juries seeking an excuse to evade the stern dictates of the law, is properly rejected by the authorities generally. The possibility of the existence of such a mental condition is too doubtful, the theory is too problematical, and too incapable of a practical solution, to afford a safe basis of legal adjudication. It may serve as a metaphysical or psychological problem, to interest and amuse the speculative philosopher, but it must be discarded by the jurist and the law-giver in the practical affairs of life. To it may well be applied the language of Judge Curtis, who, in speaking of this and similar questions, says: "They are an important, as well as a deeply interesting, study, and they find their place in that science which ministers to diseases of the mind. * * * But the law is not a medical nor a metaphysical science. Its search is after those practical rules which may be administered without inhumanity, for the security of civil society by protecting it from crime. And therefore it inquires, not into the peculiar constitution of mind of the accused, or what weakness, or even disorders, he was afflicted with, but solely *whether he was*

*capable of having, and did have, a criminal intent.* If he had, it punishes him ; if not, it holds him dispunishable." *United States* v. *McGhee*, 1 Curt. 1.

The latter clause of the instruction in question is copied — as, indeed, the whole instruction is — from the syllabus, or head-notes, of *The Commonwealth* v. *Rogers*, 7 Metc. 500, but it fails to embody the qualification and restriction thrown around the doctrine in the opinion itself.

The uncontrollable impulse which the learned chief justice declares will excuse the act is said to be that " which overwhelms reason, conscience, and judgment." " If so," says he, " then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of the mind directing it." In other words, it is the uncontrollable act of a mind destitute of reason, conscience, or judgment as to the particular object, however sane as to other matters. The latter clause of the instruction, therefore, should have been restricted by words conveying the idea that the act was the direct result of an uncontrollable impulse, springing from mental disease, existing to so high a degree that for the time it overwhelmed the reason, judgment, and conscience.

The exceptions taken to the action of the court in its rulings on the evidence are without merit.

For the errors indicated in the instructions, the judgment is reversed and a new trial awarded.