PULLEN *v.* STATE.

(In Banc. May 11, 1936.)

[168 So. 69. No. 32065.]

J. W. Conger and Mary Sue Brannon, both of Winona, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

816

Argued orally by **Mary Sue Brannon** and **J. W. Conger**, for appellant, and by **W. D. Conn, Jr.,** and **C. E. Morgan,** for the state.

**McGowen, J.,** delivered the opinion of the court.

The appellant, Wilson Pullen, was tried and convicted of the murder of Dave McClellan, in the circuit court of Montgomery county, and the jury, by its verdict, found him guilty as charged in the indictment, and he was sentenced to be hanged. He prosecutes an appeal here.

The defendant, or appellant, entered a plea of not guilty to the indictment, but did not plead especially not guilty because of his insanity.

The appellant was a "share-cropper," living on Dave McClellan's place, and their homes were about two hundred yards apart. The appellant had been living there during the year, and the homicide occurred in October. On Sunday afternoon, before the 17th day of October, 1935, the dead body of McClellan was found lying on a pallet in the hall of his home. His brains had been blown out with a shotgun. There was a screened door through which the shot had been fired, and his head was in such a position with respect to the hole in the door as to indicate that the shot was fired into the back of his head at a time when he was asleep on the pallet. On the night before, McClellan had attended a meeting and returned home about midnight. On the day of the homicide, there was an all-day singing at Nation, and Mrs. McClellan, the wife of the deceased, her aunt, Mrs. Haynes, and the grandchild of Mrs. Haynes attended this meeting. Mrs. Pullen, wife of the appellant, and two of her children went on the same bus with Mrs. McClellan, leaving to attend the singing in the forenoon. McClellan was at home alone; and the appellant and his young son were at home. About 2 o'clock in the afternoon the appellant and his young son were seen near the McClellan home. About 5 o'clock in the afternoon Mrs. McClellan and Mrs. Haynes returned on the bus from the singing to the former's home, and, upon entering it, his wife found the lifeless body of her husband, as above described. On the following day the officers of the law arrested the appellant and charged him with the murder of McClellan.

The record discloses that the relations between the McClellans and the Pullens had been friendly, no display of ill will having been shown, and that Pullen had been unable to sell the cotton he had raised, on account of McClellan's refusal to "sign up" with the government's cotton acreage reduction program, and because thereof he was unable to get "ginning certificates" to

gin and market his cotton. The evidence abundantly shows that the appellant had evinced great distress and worry, and had brooded over the situation.

After the body of McClellan had been discovered, the officers proceeded to question persons who might know something of the cause of the tragedy. The appellant was questioned, and he stated that he was in his cane patch with his little son, who heard the report of a gun, but that he did not hear it. He denied all knowledge of the homicide. Subsequently, when the officers questioned him, and he made conflicting statements, the boy stated that he was with his father in the cane patch, but admitted to the officers that his father had told him to make that statement. The officers found a shotgun owned by the appellant in his home. It was a 12-gauge single barrel shotgun and was found to have been recently discharged. Some tracks leading towards the appellant's home and away from McClellan's home were discovered near a barrel near the screen door of deceased's home. Later, appellant made a different statement.

Appellant was arrested late in the afternoon of the day after the homicide was committed, and taken to jail at Winona by the sheriff and others, and shortly thereafter he was driven in an automobile to Greenwood and there lodged in jail by a deputy sheriff, J. T. Wilson. Later Smith, the sheriff of Montgomery county, in the presence of the sheriff of Leflore county and one of his deputies, had a conversation with the appellant, and he made a confession of his guilt to them. The testimony of these several witnesses was offered in evidence.

Wilson, the deputy sheriff, testified that as they were proceeding to Greenwood from Winona the appellant would ask if that "was the last hill," and when they finally reached the Delta, this question was repeated, and he then asked why he was being carried to the

Greenwood jail. Wilson replied, "Well, we never know in these cases, we don't know the cause of the trouble." The sheriff of Montgomery county, this deputy, and others, after the arrest of the appellant, questioned the accused vigorously during the trip to the Winona jail, and from thence to the Greenwood jail. He admitted to Deputy Wilson that his little boy was right when Wilson told him that the child had admitted that his father was not in the cane patch when the child heard the report of the gun, his reply being, "I will just tell you. . . . The little boy told the truth. . . . I killed him and I am not sorry of it." This conversation occurred just under what is called "Valley Hill" on their drive from Winona to Greenwood.

The appellant made a statement to R. M. Smith, sheriff of Montgomery county, and others, in the jail at Greenwood, Smith's testimony in regard thereto being:

"A. I . . . told him I understood he was ready to tell about the killing; he says 'Yes, I have already told it.' . . .

"A. Well, he said that—he described about being at home by himself except for his little boy; said his father stayed with him until noon and they went over to his sister's house for dinner and that they came back after dinner and his father suggested that he was going to church, and that he and his little boy came on home and after he got home he and his little boy walked up to Mr. McClellan's house and he found Mr. McClellan asleep on a pallet in the hall and that he went back home—he and his little boy passed Mr. McClellan's a little piece and went back by the house and on to his own house, and that he sent his little boy to the cane patch and he got his shotgun and went back and shot Mr. McClellan while he was asleep.

"Q. Did he say what position he was in when he shot him? A. Yes, sir, he described it, the same position he was in when I found him; he was lying on a

pallet asleep with his head north and his feet to the south. . . .

"Q. Did he tell you what he did after he shot him? A. Yes, sir.

"Q. What was that? A. He said he ran around the house and went through a gap and then through a thicket home; he didn't go the regular path from one house to the other.

"Q. Did he tell you what he did with the gun after he shot him and ran home? A. Yes, sir, said he dropped the gun on the way home, and that after he got home he took the empty shell out of the gun and I asked him what he did with the shell and he said he didn't remember, and he further stated that he loaded the gun again.

"Q. Did he tell you what he killed Mr. Dave Mc-Clellan for? A. Yes, sir, I asked him why he killed him and he says 'Well, Mr. McClellan never contracted with the Government about his cotton, never signed a contract to reduce the acreage' or something like that, and he couldn't get hold of any certificates to sell his cotton, that he had two bales of cotton he was anxious to sell as he needed to buy some supplies for his home, and Mr. McClellan refused to sign a contract. . . . that Mr. McClellan had said he didn't give a damn whether he sold a lock of cotton. . . .

"Q. Did he make any statement about whether Mr. McClellan was aware of any ill feeling between them? A. . . . He said no but he was mad about it, that he didn't like it at all; I also asked him when he decided to kill Mr. McClellan and he said he decided it after he went up there and saw him asleep."

All the witnesses who testified as to appellant's confessions stated that they were made freely and voluntarily, without any threat or coercion, or without any promise of hope of reward. He was frequently advised by the officers that he need not make any statement at

all, and if he made one, it would be used against him, that they would testify regarding it if it became necessary.

Counsel for the defendant offered testimony which, it is urged, tends to establish a reasonable doubt as to appellant's sanity at, and before, the time of the homicide. Summarizing this testimony, it was stated that appellant appeared to be "worried," "bothered," "seemed like his mind wasn't right or something," was nervous, and "acting peculiar;" had been "awful bothered" about cotton certificates, "terribly depressed," "looked so strange," had "a sad, strange look," and was "childish." The wife of the appellant testified that her husband "has just been worry himself to death," "didn't hardly sleep," and that she just could not believe that he was temporarily insane. One of the witnesses testified that on Saturday, before the homicide, the appellant appeared stupid. It was further testified that he did not seem to have as much to say as he had been in the habit of saying, and that he acted "peculiar," and that "he didn't look right;" that he had "always had little peculiar ways all his life," "just a little curious from the general run of people." The witness who testified to the last statement, when asked if the appellant was crazy, replied, "No, sir, I never taken him to be crazy." Another witness stated that he met appellant on Saturday, and he "looked pale-like."

The young son of the accused, offered as his witness, did not reply when asked his age. He is spoken of as a "little boy" throughout the record. He testified that his father was in the cane patch at the time he heard the report of the gun on Sunday afternoon.

The appellant was also permitted to show that his father could neither read nor write, and that he was weak mentally. He was further permitted to show that his mother had been weak in mind, or mentally deficient for many years; that she was subject to spells or "fits."

She was lying on the floor of the witness room during the trial of the case, and witnesses were asked about her condition from time to time as they came in from the witness room by appellant's counsel. The accused did not testify.

All the evidence in this case shows that the confessions made by the accused, or appellant, were free and voluntary. There is no contradiction in the record. No sort of examination as to the physical condition of the appellant was offered, nor did any witness intimate that there was any coercion, fear, or undue pressure imposed upon the accused by which a confession was extorted. It is argued by counsel for the appellant that the continued examination before, and on, the trips to Winona and Greenwood amounted to such a gruelling as to have forced an involuntary confession from him. He argues that the answer of Deputy Wilson to appellant's question as to why he was being taken to Greenwood, to the effect, ''Well, we never know in these cases, we don't know the cause of the trouble,'' indicated a threat of mobbing, which aroused fear in the appellant. There is no merit in either of these contentions. See Ouida Keeton v. State (Miss.), 167 So. 68.

There is nothing to indicate that this confession did not emanate from the free will of the accused, and without the inducement of hope or fear. The precedent questioning of the accused in the case at bar is not comparable as to its severity to that which is depicted by the record in the Keeton Case, supra.

Appellant further complains of the modification of certain instructions by the court. The record here shows no such modification; the brief of counsel only advises of it. The record must show the modification. See Middleton v. State, 97 Miss. 278, 52 So. 258. Appellant should have had the record to show that he declined to use the instructions as modified if that had been the fact. As the record here discloses, this court must as-

sume that these instructions were read to the jury. Appellant does not say that they were not so read. Williams v. State, 95 Miss. 671, 49 So. 513.

It is next insisted that no motive was shown. It may be conceded that no sufficient motive was shown to justify a man in concluding that he had the right to kill his fellow man; but appellant stated that he killed McClellan because he refused to get the gin certificates so that he could sell his cotton, and said he was mad. Motive is not an indispensable element of murder. See Johnson v. State, 140 Miss. 889, 105 So. 742; Buckler v. State, 171 Miss. 353, 157 So. 353; Motley v. Smith, 172 Miss. 148, 159 So. 553.

It is next insisted that the court erred in granting an instruction for the state as follows: "The Court instructs the jury for the State that insanity can not be a defense to a criminal charge, if the defendant knew the difference between right and wrong at the time of the alleged crime in question."

It is urged that the instruction is incomplete, should have concluded with the statement that, at the time he committed the act, the accused had the ability to realize and appreciate the nature and quality thereof. We think the instruction, as given, is in all material particulars the same as that which was fully considered by this court in the case of Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A. (N. S.) 461, Ann. Cas. 1912A, 23, wherein the court said: "Where the defense is insanity, total or partial, the test of the defendant's criminal responsibility is his ability, at the time he committed the act, to realize and appreciate the nature and quality thereof—his ability to distinguish right and wrong. Grissom v. State, 62 Miss. [167] 169." In the Smith Case, supra, the court added to an instruction on insanity for the defendant these words: "that he was unable to distinguish moral right from wrong." Since the decision in the Smith Case, this court has been com-

mitted to the doctrine that the test or not of sanity is whether the accused is able to distinguish between right and wrong. The last case so stating was Eatman v. State, 169 Miss. 295, 153 So. 381.

We think that there was no error in the giving of the instruction or in modifying the given instruction for the defendant in this particular under these authorities. We further say that error could not be predicated upon the instructions in this case on the question of sanity or not, for the reason that all the evidence offered by the defendant for that purpose did not tend to raise the question of insanity to the extent that such evidence created a reasonable doubt of defendant's sanity at the time of the homicide. In other words, the appellant was presumed to be sane, and in this case the state was not required to go further with its proof.

In the Eatman Case, supra, this court said: "Peculiarities of conduct on occasions do not amount to proof of insanity, else, in the judgment of many men, most of the people, other than themselves, would be insane." And, as stated in that case, a peremptory instruction would have been proper on the so-called issue of insanity presented in the case at bar. Such evidence did not tend to establish a reasonable doubt of the sanity of the accused. It merely showed brooding on account of a wrong which the appellant conceived had been perpetrated upon him by the deceased. The court, however, was liberal and submitted the issue to the jury. There was no evidence of hallucinations or delusions exhibited by the appellant.

We find no reversible error in this record, and the cause will be affirmed and the date of the execution of the appellant, by the infliction of the death penalty, fixed as Friday, June 19, 1936.

Affirmed.