WAYCASTER *v.* STATE.

(En Banc. March 13, 1939.)

[187 So. 205. No. 33503.]

T. N. Gore and L. Q. Strong, of Marks, and A. C. Campbell, of Tutwiler, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

Argued orally by **A. C. Campbell**, and **T. N. Gore**, for appellant and by **W. D. Conn, Jr.**, for the state.

**McGehee, J.**, delivered the opinion of the court.

The appellant, L. R. Waycaster, was tried and convicted in the Circuit Court of Quitman County on the charge of having murdered Mrs. Fay Ferguson, and was sentenced to be hanged. The testimony shows without conflict that he shot and killed the deceased without any real or pretended cause or provocation. The only defense interposed was the plea of insanity. The testimony both for the State and for the defense disclosed that the appellant's state of mind had been abnormal during the last few months immediately prior to the killing. However, all of the evidence relating to the issue of insanity was excluded by the court from the consideration of the jury upon motion of the State on the ground that it failed to meet the legal requirement of showing that the appellant could not distinguish between right and wrong at the time he shot and killed the deceased. No other reason for the killing having been assigned by the defense at the trial, the issue was submitted to the jury, as being uncontroverted, that the killing by the appellant was pursuant to a wilful and deliberate design to commit the crime of murder.

The record discloses that prior to the killing the appellant enjoyed a good reputation for peace or violence; that he had been an upright and law-abiding citizen; that prior to the year 1938 he had made a competent and efficient plantation manager in the section where he has resided; that for the year 1938 he was employed as the manager of the plantation on which this killing oc-

curred, and that prior to the killing he began to show signs of incompetency in the performance of his duties; that during the month of March his second wife died after a brief illness, leaving four children between the ages of one and five years, and there were seven children by a former marriage, among whom was a grown son, Carlton Waycaster, whose testimony will be hereinafter mentioned; that on the morning of the death of his second wife, the family physician who had attended her on the night before saw the appellant in a cafe at Tutwiler eating his breakfast, and whereupon the physician inquired about his wife and was told by the appellant "she beat me to town," meaning thereby that she was over at the undertaker's parlor, the appellant's expression not having changed when he made this remark, and while he continued eating his breakfast as if nothing serious had occurred; that the family physician regarded him abnormal from that time on; that about fifteen days prior to the killing, the appellant's grown son, Carlton Waycaster, became so disturbed about his father's mental condition that he wrote to his father's brother at Tupelo to come, and the letter disclosed the fact that the writer was convinced that his father was mentally unbalanced. It was mailed at Vance, Mississippi, by registered letter and duly received at Tupelo, and the letter an envelope bearing such date were introduced in evidence without objection; that pursuant to this letter, his uncle came and there was a discussion had between the writer and his uncle and Pete Ferguson, husband of the deceased, regarding the appellant's then mental condition; that his state of mind seemed temporarily improved by reason of his brother's visit, but that on the morning of the killing the appellant went to the home of Pete Ferguson and stated to the deceased that he intended to kill her, Mrs. Ferguson, her husband, Pete Ferguson, and four other unnamed persons during that day; that Mrs. Ferguson went immediately to the field and related the circumstance to her husband and told him

that the appellant was acting peculiar on his visit to the house, and that there was something wrong with him; that thereupon she returned to her home while her husband went immediately to the appellant's house where he observed the appellant through a window examining his pistol; that Pete Ferguson then returned to his own home and arranged with Mrs. Ferguson to accompany him to the field for her own safety; that en route to the field they arrived at a tenant house where a negress, Agnes Coats, lived; that Mrs. Ferguson stopped in to see Agnes Coats and was seated on her porch for the moment when she and her husband saw the appellant approaching; that when the appellant reached this house he entered the yard and stated "here is where it comes off" and began shooting at the deceased; that the first shot missed her, the second struck her in the neck, and that then prior to the third and fatal shot, she begged him to let his pistol down and let her talk to him; that as soon as he had killed Mrs. Ferguson he then pointed his pistol in the general direction of her husband, but without taking any aim, and fired; that the appellant then returned home where his son induced him to go to the county site and surrender to the officers; and that when interviewed he admitted the killing but assigned no reason for his act.

Pete Ferguson was introduced by the State as an eye-witness to the killing, and after relating different acts of strange conduct on the part of the appellant prior to the day of the killing, he was asked this question: "Now, give the court and jury your opinion—did he know what he was doing, in your opinion?" And, to which question he replied "No, I don't guess he did". The witness here had reference to the time of the killing. The witness, who was the husband of the deceased as heretofore stated, was somewhat reluctant, and in a manner denied having made certain statements alleged to have been made by him on the next morning after the killing occurred, and whereupon the defense showed by the Baptist minister at Tutwiler, who was to conduct the funeral of the de-

ceased, that he asked Pete Ferguson at the funeral parlor the cause of the tragedy, when Ferguson replied: "There was not any trouble at all, and had not been, Mr. Waycaster was just crazy." That he also stated: "Now Brother Martin, that is all I know, he is just crazy and has been crazy for the last two or three months; I have been with him pretty close and kept him from killing himself some several times. Something along this line does not surprise me at all." He also told some of the witnesses that he had been afraid that Waycaster might kill some of his own children. Mrs. Weary testified that she heard the above mentioned conversation between Pete Ferguson and the minister. Ferguson also testified at the trial, as a witness for the State, that he and his wife and the appellant were all good friends; that there were no improper relations whatever between the appellant and Mrs. Ferguson, and he was unable to assign any reason for appellant's act. Moreover, the old colored woman, Agnes Coats, who witnessed the killing, testified for the State and said that she had observed the appellant acting like a man who was taking "coke," and explained that she had a relative who took cocaine, and that the appellant acted like a man who was taking "coke." However, the evidence does not show that the appellant either used cocaine and other like drugs or that he was a drinking man. Other witnesses testified to numerous acts of the appellant unnecessary here to relate tending to show that he was irrational or "not in his right mind," and in effect said that he was irrational. The family physician, after testifying that the appellant was abnormal, refrained from making the positive statement that he was insane; but he did venture to suggest, by way of explanation, that a man could not be both abnormal and normal. The jury may have reasonably inferred that the fair import of the doctor's testimony was that the man was not sane. While it is true that none of the witnesses, except Carlton Waycaster, were asked the specific question as to whether the appellant in their

opinion was capable of understanding the nature and character of his act to the extent of knowing right from wrong, nevertheless, the substance and effect of their testimony was such as may have been calculated to raise a reasonable doubt in the mind of the jury as to whether he had such mental capacity. It would have been proper for the jury to have been advised of this legal test under proper instructions as to the measure of proof required to support the plea of insanity in the light of the facts and circumstances testified to and the opinions expressed by the witnesses.

The trial commenced with the presumption that Waycaster was sane. If nothing in the testimony, either on behalf of the State or the defendant, had suggested otherwise, there would have been no obligation on the State to establish his sanity. However, when such testimony as that hereinbefore mentioned was offered either by the state or the defendant sufficient to suggest a reasonable probability to the mind of any juror that he may not have been sane at the time of the killing, or to raise a reasonable doubt in regard thereto, the state was then required to establish the fact of sanity independently of the presumption in that behalf. The rule to be deduced from what has been said by the text writers on criminal evidence is that the trial court determines the competency of the witness, whether expert or non-expert, to testify, and the weight to be given to the opinion of the witness, if competent, is for the jury alone. The rule to be followed under our own jurisprudence is that announced by this court in the case of Cunningham v. State, 56 Miss. 269, 21 Am. Rep. 360, where it was said. ''We think the true rule is this: Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to

the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case''. It may frequently occur that the facts and circumstances testified to by non-expert witnesses, and the opinions expressed by them in regard thereto, may not be sufficient to raise a reasonable doubt in the mind of the trial court of the sanity of the accused, but the test should be whether the acts and conduct of the accused, and the opinions of the witnesses on the issue of his sanity, would be reasonably calculated to raise such doubt in the mind of any of the jurors. Underhill's Criminal Evidence (3 Ed.), sec. 264, page 376; Wood v. State, 58 Miss. 741; Reed v. State, 62 Miss. 405; Bishop v. State, 96 Miss. 846, 52 So. 21. Nor is evidence to show insanity confined to the mental condition of the accused at the instant of the act, though whatever facts are adduced must tend to show his mental state at that moment; and it is proper to allow considerable latitude in the examination of the witnesses, since every fact and circumstance, transpiring prior to or soon after the act in question, which shows or tends to show that the mental condition of the accused was abnormal at the time of the alleged crime is competent. Underhill's Criminal Evidence (3 Ed.), sec. 261, page 369, Brock v. State, 92 Miss. 712, 46 So. 67, and Bishop v. State, supra.

We assume that all of the evidence touching the question of insanity was excluded in the case at bar under the authority of the cases of: Tidwell v. State, 84 Miss. 475, 36 So. 393; Jones v. State, 97 Miss. 269, 52 So. 791; Garner v. State, 112 Miss. 317, 73 So. 50; Eatman v. State, 169 Miss. 295, 153 So. 381; Pullen v. State, 175 Miss. 810, 168 So. 69. However, we are of the opinion that these decisions are not controlling in the instant case for the reason that such of the facts as are stated in these reported cases present a different case to that disclosed by the testimony on the issue of insanity in the present case.

We think that the excluded testimony should have been allowed to go to the jury, and that the state should have been required to meet the issue thus raised.

Reversed and remanded.