285 So.2d 756 (1973)
David WARREN
v.
STATE of Mississippi.
No. 47465.
Supreme Court of Mississippi.
December 3, 1973.
Nathan P. Adams, Jr., Felts, Russell & Adams, Greenville, for appellant.
A.F. Summer, Atty. Gen., by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
WALKER, Justice:
This is an appeal from the Circuit Court of Washington County where appellant. David Warren, was convicted of the crime of attempted rape of a fifty-nine year old housewife and sentenced to serve six years in the state penitentiary.
The evidence showed that on October 20, 1971, appellant who had been plowing in a nearby field went to the victim's home on the pretense of needing an aspirin, jerked open the door, went inside, told her, in vulgar language, what he was there for, threw the victim to the floor and attempted to have sexual relations with her.
The thrust of appellant's defense was that he has been so feebleminded all of his life that he was unable to distinguish between right and wrong, was legally insane and not responsible for the alleged attack.
This brings us to the question of whether the State met its burden of proof to show that the defendant had the ability, at the time he committed the act, to realize *757 and appreciate the nature and quality thereof  had the ability to distinguish right from wrong.
The witness introduced by the defendant for the purpose of raising the question of appellant's sanity showed as follows: His mother, Lillie Bell Warren, testified that appellant was twenty-one years of age at the time of the alleged incident, was one of six children, that when he was about a year old he began to have spasms or fits and would lie stiff in bed, roll his eyes back and foam at the mouth. These spasms or fits occurred about every month, and, as a consequence, appellant was unable to complete the first grade. That he was taken to several doctors and a major tranquilizer was prescribed for these spasms. That she and her husband had to take care of appellant throughout the years because he had the mind of a child and did not know the difference between right and wrong. However, she testified that appellant was able to dress himself, do part-time work, drive a tractor and go to church, but that he was usually under her's or her husband's supervision. That on one occasion he walked in the middle of the road and would not get out of the way of cars, and he did not have an understanding of how to buy clothes; therefore, his father had to buy them for him. She testified also that in her opinion he was insane. Appellant's father, Johnny Warren, substantially confirmed the statements of Mrs. Warren but added that appellant worked occasionally as a tractor driver and for approximately seven months he worked in Florida pouring concrete for a brickmason.
Randolph Stafford, pastor of the church which the Warrens attended, stated that he had majored in behavioral science at Oakwood College in Huntsville, Alabama, and had taken graduate courses in education of the mentally retarded at the University of Southern Mississippi and that on several occasions he had contact with appellant before he was arrested and had seen him fifteen or twenty times since then. Stafford stated that the appellant exhibited similar characteristics of children he had seen at the school for the mentally retarded in Ellisville, Mississippi, and further that he did not think appellant understood the nature of the situation he was involved in.
The next witness for the defendant was Dr. James E. Stary, chief psychologist at Mississippi State Hospital at Whitfield, who testified that he supervised the administering of the Wechsler Adult Intelligence Scale (WAIS) I.Q. test on defendant between December 20, 1971 and January 27, 1972, at the request of Dr. A.G. Anderson, psychiatrist in charge of the forensic unit at the hospital. The results of the test revealed that appellant had a full scale I.Q. of 66 which fell within the mild mental retardation range. He explained that there are five categories of mental retardation with borderline being the highest in an I.Q. classification from 84 to 70, mild range running from 69 to 55, moderate range running from 54 to 40, severe from 39 to 24, and anything below 24 being classified as profoundly retarded. He further testified that a person with this I.Q. range (66, appellant's range) could conduct himself in society and know the difference between right and wrong.
The State argues that the defendant, by this evidence has not created a reasonable probability that he was insane so as to rebut the presumption of sanity. The rule in Mississippi is found in Cunningham v. State, 56 Miss. 269, 276 (1879):
Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond *758 all reasonable doubt arising out of all the evidence in the case.
(Butler v. State, 245 So.2d 605 (Miss. 1971); Gambrell v. State, 238 Miss. 892, 120 So.2d 758 (1960); Kearney v. State, 224 Miss. 1, 79 So.2d 468 (1955)).
This is a close case on the question of whether a probability of insanity has been raised sufficient to rebut the presumption of sanity. See Pullen v. State, 175 Miss. 810, 168 So. 69 (1936) for a case where the factual situation is similar and in which the Court held that the presumption had not been rebutted. However, we have resolved the question in favor of defendant and the burden of proving defendant's sanity beyond a reasonable doubt devolved upon the State.
In meeting this burden, the State responding to the issue of insanity offered Dr. A.G. Anderson, a specialist in psychiatry at the Mississippi State Hospital at Whitfield, who, after giving his qualifications, stated that appellant had been sent to the hospital for a mental examination on order of the court. After detailing the method of examination, he testified that he was unable to find any evidence of psychotic thinking or behavior in appellant and that in his opinion that he was sane at that time. He further testified that appellant was given a diagnosis of mild, mental retardation. In answer to further questions, he testified, without objection, that in his opinion the appellant knew, at the time of the examination, the difference between right and wrong and that he was fully capable of assisting his attorney in his defense. Dr. Anderson testified further that in addition to examining appellant at the hospital that he had examined him the day prior to the trial and that "... he (appellant) was in clear contact, he was aware of his surroundings, he was well aware of the charge that was being held against him at this time, and he was well aware that he was just about or just getting ready to go on trial, and it was my opinion at that time that I could see no evidence of any psychotic thinking. He did, however, as I say, still show the evidence, of course, that he was functioning in the mildly retarded range."
The jury also had before it the detailed testimony of the victim who testified that appellant had come to her back door twice the day before the incident asking for a drink of water, which she gave him. She also testified that after she had struggled with appellant and had cut her hand on the pocket knife, "He told me that he wouldn't kill me if I would promise him that I wouldn't tell anybody, and I promised him I wouldn't tell, and he told me to tell Mr. Parker, when he come (sic) in from work, that I cut my hand on a can opener." She also testified that he had made her go into the yard and stand there until he left. This conduct strongly indicates that appellant had the ability to reason and appreciate the nature and quality of his act and that he could distinguish right and wrong.
Mr. B.J. Tonnar, who appellant was working for on the day of the alleged attack, testified, without objection, that appellant had worked for him on a few occasions and that he also worked for another neighbor quite a bit by the name of Larry Dunaway and that he worked full time for one John Ed Ainsworth. In response to the following question asked by appellant's attorney on cross-examination:
... were you able to form an opinion as to whether he (appellant) was smart or dumb?
The witness responded:
Well, that would be kind of hard to form. I guess he would be average.
Again, while the witness was testifying on rebuttal for the State he was asked:
Q. Did you have an opportunity to see the field in which David Warren *759 was working on the 20th of October, 1971?
A. Yes, sir.
Q. You actually went to the field?
A. Yes, sir.
Q. Could you describe what kind of work David was doing that day?
A. Well, for the type work he was doing, he was more than satisfactory, I thought.
He was later asked:
Q. Will you tell us what the field was like? ...
A. Well, the field was a rectangular field that ran north and south, and the south end of this particular field was joining the Parker residence. It was approximately about a three foot ditch, I guess, between them, in depth, and the field was approximately, I would say, about three thousand feet long, running north and south, and approximately about fifteen hundred feet wide.
Q. All right, and what was the nature of the instructions, if any, that you had given Mr. Warren on this occasion?
A. Well, when I started him to disking down there, I told him to disk it on an angle, and I wanted him to start in the southeast  the southwest corner of it and go across in the other direction, and that corner joined the yard of the Parker residence and part of their place up in that particular corner.
Q. When you examined the field, were you able to determine how the field had been disked?
A. Yes, sir.
Q. How had it been disked?
A. It had been disked according to the way I instructed him to disk it.
This is in sharp conflict with the testimony of appellant's mother and father who inferred that appellant was unable to function except under their direct supervision.
The jury also had before it the testimony of Albert Tackett, deputy sheriff, stating that when he advised appellant of his constitutional rights he refused to make any further statement. Tackett was also asked the following questions by appellant's counsel on cross-examination:
Q. All right, sir, and were you able to observe this man while he was in jail?
A. Yes.
Q. Were you able to talk to him?
A. I talked to him.
Q. Were you able to form an opinion as to whether he was smart or dumb?
A. Well, he talked all right, he didn't act, you know, off in any way. I talked to him and he would answer my questions.
It is well settled that considerable latitude is afforded in the examination of witnesses on the question of sanity.
In McGarrh v. State, 249 Miss. 247, 276-277, 148 So.2d 494, 506 (1963), this Court observed:
The rule being that, where the defense is insanity, the door is open, and that considerable latitude should be allowed in the examination of witnesses to show any abnormality of mental condition at the time of the crime, Cunningham v. State, [56 Miss. 269], Smith v. State, [95 Miss. 786, 49 So. 945], Waycaster v. State, supra, [185 Miss. 24, 187 So. 205], conversely, the same mode of procedure is available to the State to offer evidence as to no abnormality. (Emphasis added).
Every fact and circumstance transpiring prior to or soon after the act in *760 question which shows or tends to show the mental condition of an accused at the time of the alleged crime is competent. Waycaster v. State, 185 Miss. 24, 187 So. 205 (1939); Bishop v. State, 96 Miss. 846, 52 So. 21 (1910); Underhill's Criminal Evidence (3rd ed.) Section 261 at page 369.
Appellant contends that the verdict of the jury was against the overwhelming weight of the evidence. We are of the opinion that under this evidence appellant's sanity was a question for the jury and that they had ample evidence upon which to find appellant was sane at the time of the commission of the crime beyond a reasonable doubt. In this regard we would point out that a jury's verdict will not be set aside unless it is manifestly erroneous or based upon bias, passion, prejudice or fraud. Campbell v. State, 278 So.2d 420 (Miss. 1973). Also the credibility of the witnesses and the weight and worth to be given their testimony is for the jury to determine. Campbell v. State, supra; McLelland v. State, 204 So.2d 158, 164 (Miss. 1967).
Appellant next contends that the State committed fatal error in not asking the psychiatrist, Dr. Anderson, a specific question as to appellant's sanity or insanity or his ability or inability to distinguish right from wrong at the time of the commission of the crime. Although it would have been desirable to have Dr. Anderson's opinion as to appellant's sanity at the time of the commission of the offense, its absence is not fatal. Dr. Anderson's testimony is but one part of the evidence, and the defendant's sanity at the time of the commission of the offense is to be determined from the whole of the evidence before the jury.
Although the appellant agrees that the test for criminal responsibility in the State of Mississippi is the M'Naghten rule[1] which is that where the defense is insanity, total or partial, the test of the criminal's responsibility is his ability, at the time he committed the act, to realize and appreciate the nature and quality thereof  his ability to distinguish right and wrong. Pullen v. State, 175 Miss. 810, 168 So. 69 (1936); Eatman v. State, 169 Miss. 295, 153 So. 381 (1934); Smith v. State, 95 Miss. 786, 49 So. 945, 27 L.R.A., N.S., 461 (1909), annotated cases 1912A, 23; Grissom v. State, 62 Miss. 167, 169 (1884). Appellant, nevertheless, insists that he should have been committed to an institution for the feebleminded (Ellisville State School) and cites as authority therefor Mississippi Code 1942 Annotated sections 6764 and 6777 (1952). Section 6777 provides what is to be done with a person "... feeble-minded to such an extent as not to be responsible for his or her act or omission at the time when the act or omission charged was made, ..." Appellant's contention is not well founded for that reason that, as heretofore pointed out, he was found to be legally responsible for his act.
We are unable to find nor has appellant cited any authority whereby a circuit court can sentence a sane, adult offender, after conviction, to an institution other than that provided for by the statute under which the offense was charged. The penalty under the statute in this case provides for a sentence to the state penitentiary for a period of not more than ten years. Appellant was sentenced to serve six years under said statute and since that sentence was not suspended, he must stand committed to the state penitentiary.
We have carefully considered the other assignments of error and find them to be without merit.
We are, therefore, of the opinion that this case should be affirmed.
Affirmed.
RODGERS, P.J., and SMITH, ROBERTSON and BROOM, JJ., concur.
NOTES
[1] See Harvey v. State, 207 So.2d 108 (Miss. 1967) for a scholarly discussion of the history of the M'Naghten rule by Justice Henry Lee Rodgers.