374 So.2d 808 (1979)
Billy Ray KING
v.
STATE of Mississippi.
No. 51343.
Supreme Court of Mississippi.
September 5, 1979.
Rehearing Denied September 26, 1979.
*809 Laurel G. Weir, Philadelphia, for appellant.
A.F. Summer, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and BROOM and COFER, JJ.
COFER, Justice, for the Court:
Appellant Billy Ray King was indicted in November 1977 by the Circuit Court Grand Jury of Leake County on a charge of aggravated assault upon his then wife, Mary Jane King, by causing serious bodily harm to her by beating her with his hands and fists and a pistol under circumstances manifesting extreme indifference to human life. The *810 indictment charges the offense made a felony by Mississippi Code Annotated, section 97-3-7 (1978 Supp.). Trial of the case resulted in conviction by the jury and a sentence of ten years in the penitentiary.
On appeal here, appellant King assigns five errors:
1. The overwhelming weight of the law and evidence showed appellant not guilty by reason of insanity and of being incapable of making a rational defense and the court erred in permitting a verdict of conviction to stand under the circumstances and in overruling the motion for new trial.
2. The lower court erred in refusing to allow the testimony of the only eye witness, Michael King.
3. The lower court erred in not granting a new trial in view of the testimony that the jury had been discussing the matter with the prosecuting witnesses during the trial.
4. The lower court erred in not sequestering the jury.
5. The appellant was not properly represented by adequate counsel during the trial.
The evidence with scant, if any, conflict, reveals that appellant, on the occasion complained of, came home after having been drinking beer; that he told his wife that their son was nearly run over as he was getting on the school bus, and blamed her because she was not at home, and accused her of being engaged in illicit relations and of untruthfulness when she denied the accusations. He commanded her to follow him into the bedroom, where he began beating her with his fists, accusing her of falsehood and of being with another man and telling her she was going to tell him who the man was or he would kill her. He held her hair and beat her with his fist; she was screaming; she got away from him and ran into the living room where their son Michael was asleep. The child awoke and appellant told him to take Christy, another of their children, and go to a neighbor's house, and stay there and that he had better not tell the neighbors what was going on.
His accusations against her were then resumed, and he threatened to kill her, saying he would put a stop to it if he had to blow her brains out. He got a loaded pistol they kept in the house, pulled her, bleeding, into the bedroom, and hit on her head with the pistol. The pistol fired three different times, either being fired by him or by going off, and the slapping, beating, accusations, and threatening continued for some thirty minutes. A man came to borrow some tools, and appellant called his attention to the beating he had given the victim, and told him that she was going to tell him who the man was or he would blow her brains out. By signs to him, the victim motioned to the man to call the law. About thirty more minutes passed, the course of mistreatment continuing, and the sheriff arrived. Appellant told her, that if the sheriff came in the house, or if she ran for the door, he would shoot her in the back, and would kill the sheriff if he started in the door. He told the sheriff there was no disturbance and for him to leave. Appellant resumed his abuse of her, hit her again with the pistol, and told her if she undertook to run or go to a neighbor's house, he would kill her.
Appellant called his attorney and told him what he had done.
Her mother came and took her to the hospital where she stayed for nine days. Photographs graphically revealed that she was in a battered condition when they were made.
Insanity being relied upon in the trial and here in appellant's first assignment of error, the victim testified that he had been to a psychologist, Dr. Elliott, that afternoon, but denied that he was having mental troubles at the time, but was complaining of headaches, and the record reflects he was subject to having headaches. She also testified that she believed appellant knew right from wrong, on the day of the alleged assault, and that, on the occasion of his beating her, he acted like he always did when he jumped on her  not like a wild man, he was just drunk.
*811 Defense witnesses, mostly close relations, and Dr. Elliott testified concerning appellant's sanity. Mrs. Sue Palmer, his sister, testified that, about the time of the occurrence, he cried a lot, his nerves were "shot"; he would go off and then not know where he went or how long he stayed, and that he would come to her house and not know he was there. She said his weeping could have been because she was trying to talk him into getting a divorce; she said he became violent at times, would lose his temper, and would behave awkwardly at anything anybody would say. She testified that she believed he took medication for his mental condition, for "his head is all I know." She said he told her he did not know why he had beaten his wife and had no knowledge of doing it. She said, if he beat her, he did not know the difference between right and wrong. He would be sorry after he "smarted off" to other people. She said when he would become dangerous was when he had a bad headache.
Mrs. Janell Myers, appellant's sister, said that, within the preceding two years, his actions have been abnormal; that he did not know a day or two later, that he had beaten his wife; his abnormality reflected itself in his sitting and staring into space, not hearing what was being said; and going places and not later knowing that he had done so; at times he was dangerous and worried that he was about to lose his wife and children. She did not believe he knew the difference between right and wrong at the time of the beating, and that she knew he was temporarily insane.
Homer Palmer, husband of appellant's sister, testified that, before the incident, appellant acted normally at times and did not act normally at times, and he would take his feelings out in violence even with his best friends. On the same night, following the occurrence, he did not know what happened. The witness knew that appellant went to Mexico after the occurrence, and, when he got back, he did not remember where he had been. He knew appellant to lose his temper at his attorney, and, after a little while, would call him and apologize to him. He was dangerous at times. He thought that appellant was crazy during the occurrence. He said appellant did not know right from wrong when he beat the victim.
Elliott, a clinical psychologist, saw appellant professionally some forty-one to forty-six times, between January 11, 1977, and about January 4, 1978. Appellant told the witness that some time between May 4 and May 6, 1977, he beat his wife. He said appellant had periods of psychosis, during which he did not know the difference between right and wrong, and the likelihood was strong that he had become psychotic at the incident. He further testified that such period of psychosis could be brought on by external events, what he saw, or internally by what he thought. He could only conjecture as to whether he was psychotic at the occurrence.
After Dr. Elliott had testified, Mrs. Myers was recalled and told of her revealing to appellant a few days before the incident that the victim had had illicit sexual relations with the witness' husband in 1976, and it had a badly adverse effect on him.
Appellant, testifying, said he had no independent recollection of beating his wife, but he beat a man whom he apprehended on the couch with his wife, both nude, after which he remembered nothing else. He remembered coming out of Mexico, but not going there; and he had been other places without knowing it. He said he became violent at times, but later tries to apologize for it.
The presumption of appellant's sanity prevailed until an adverse reasonable probability was injected or a reasonable doubt of his sanity was created. Waycaster v. State, 185 Miss. 25, 35, 187 So. 205, 238 (1939). When the reasonable doubt thereof arose, the burden was thrust upon the state to establish his sanity "to the satisfaction of the jury beyond all reasonable doubt arising out of all the evidence in the case." Cunningham v. State, 56 Miss. 268, 276 (1879).
The burden of the state was to show appellant's ability, at the occurrence, to realize *812 and appreciate the nature and quality of the act and to distinguish between right and wrong.
Appellee points to appellant's sending the two children from the residence, instructing them to stay at the neighbor's house and not to tell the neighbors what was going on; on the sheriff's arrival, he instructed his wife not to try to leave the house or he would kill her; then he told the sheriff that there was no disturbance, and he could go; he called his attorney and told him what he had done; he asked his wife if she wanted or needed a doctor; and he fled to Mexico.
It was the jury's prerogative to take all the testimony including that as to his sanity or insanity, and with it, to arrive at a conclusion of the question based thereon. Knight v. State, 360 So.2d 674 (Miss. 1978); Smith v. State, 245 So.2d 583 (Miss. 1971). Having full instructions on the subject of insanity and the effect of its existence, if found to exist, upon its verdict of guilt or innocence, it returned a verdict of guilty wherein is manifest a finding that he was sane. Hence, we find the first assignment of error is without merit.
It is next argued that the circuit court erred in not permitting the eight year old son to testify. This assignment does not possess merit, for the child, in the court's testing his ability to testify, could not tell his birthday, and the court said, "This young boy is eight years old. I am not going to permit him to testify. I don't think it would be the right thing to do. So, I will not permit this boy to testify." Appellant did not pursue the court's action by objecting to the decision. In order to put the court in error, appellant should have stated into the record the testimony he expected to obtain through the proffered witness. Estate of Bowen v. Tubbs, 234 So.2d 51, 52 (Miss. 1970); Russell v. Miss. Central Railroad Co., 239 Miss. 741, 125 So.2d 283 (1960). Whether the child should have been permitted to testify was addressed to the court's sound discretion, and we cannot say that that discretion was abused. Perkins v. State, 290 So.2d 597 (Miss. 1974); Wilson v. State, 221 So.2d 100 (Miss. 1969).
As to the third assignment, conversations between two of the jurors and the victim and her mother, a long hearing was held on appellant's motion for a new trial. The jurors testified there was no such exchange, they had been fully instructed against such exchanges and the court found it more believable by far to accept the showing against the "jury tampering" and we consider any other conclusion would have been error.
There was no error in the court's failure to sequester the jury, in the absence of a request for such seclusion.
In Nash v. State, 207 So.2d 104, 107 (Miss. 1968), cited by appellant, there was a prompt objection to the dispersal overnight of the jurors, which caused a mistrial. We have held, in a case decided after the lower court trial, Cox v. State, 365 So.2d 627 (Miss. 1978), that in the absence of a request to the contrary by appellant or his counsel, dispersal of the jury is not error in a noncapital case.
Finally, if there was a failure on the part of appellant's counsel properly and adequately to represent him, both the trial counsel and the counsel succeeding him and handling this appeal were of appellant's own choice and retainer, and appellant may not here complain that he was not properly represented. Miller v. State, 231 So.2d 178 (Miss. 1970). In Rogers v. State, 307 So.2d 551 (Miss. 1975), it is announced that, "After all, a person charged with a crime is only entitled to a fair and impartial trial, not a perfect trial." (Emphasis added). 307 So.2d at 553.
As to this assignment of error, we strongly suspect that appellant's dissatisfaction as to his counsel sprang from continuing effort of appellant and/or his relatives to cause the trial's direction to be determined by them, this suspicion being based on the record itself.
We find no reversible error and affirm the case.
AFFIRMED.
*813 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.