KEARNEY *v.* STATE.

No. 39651          April 18, 1955          79 So. 2d 468

*Lomax B. Lamb, Jr.,* Marks, for appellant.

*Wm. E. Cresswell,* Asst. Atty. Gen., Jackson, for appellee.

McGEHEE, C. J.

In this case the appellant, Henry Bell Kearney, was convicted of assault and battery with intent to kill and murder his wife's niece, Esther Hill, and sentenced to serve a term of ten years in the state penitentiary.

The defense relied on was that the defendant's mind was so deranged at the time of the shooting that he was mentally incapable of knowing right from wrong. The sheriff had the defendant examined by a physician within an hour after the shooting, and this physician was of the opinion that he was then in a state of paranoia, and that because of this mental derangement the defendant should be committed to the Mississippi State Insane Hospital at Whitfield, where he was sent and remained for a period of more than two months. He did not consult an attorney relative to his defense until after his return from Whitfield — in other words, the proceeding which resulted in his commitment to Whitfield was initiated by the sheriff of the county, because the sheriff "thought it was the right thing to do."

On this appeal it is assigned for error, first, that the trial court should have sustained the motion of the defendant, after the State had rested its case, to exclude the evidence offered by the State and to direct a verdict for the defendant; second, that the trial court was in

error in refusing to grant the peremptory instruction asked for by the defendant, at the conclusion of all the evidence, directing the jury to find the defendant not guilty; third, that the trial court should have sustained the defendant's motion for a mistrial because of the comments made by the district attorney in his closing argument to the jury; and fourth, that the trial court was in error in overruling the motion of the defendant for a new trial.

When the motion which was made at the time the State rested its case in chief was overruled, the defendant proceeded with his defense by the introduction of the testimony of three physicians, and also by the testimony given by him in his own behalf in support of his defense of insanity, together with the testimony of other witnesses to the effect that he had previously borne a good reputation for peace or violence. Therefore the question of whether or not the defendant was entitled to the requested peremptory instruction is to be determined on the state of the testimony at the conclusion of all the evidence offered both by the State and the defendant. On that basis, the defendant was not entitled to a directed verdict in his favor, as will be hereinafter shown.

As to the third assignment of error, we find no reversible error in such of the comments of the district attorney as were objected to prior to the time when the jury retired to consider its verdict. The comment of the district attorney in regard to which a motion for a mistrial was made after the jury had retired to consider its verdict, was in the following words: "I will go further than that. Only within the last month, every doctor in Mississippi has gotten a letter that they are due to see these people before they sign these certificates; every practicing physician in the State of Mississippi has gotten a letter to that effect, so prevalent had that become." This statement by the district attorney was not justified, first, for the reason that there was no proof that "every doctor in Mississippi had gotten a letter that

they are due to see these people before they sign these certificates'' committing a patient to Whitfield; and, second, the comment was necessarily based on hearsay, since it is wholly improbable that the district attorney would have known of his own personal knowledge that such a letter had been received by every doctor in the state; and if the statement was based on hearsay, it would not have been competent for him to have so stated, even if he had been sworn as a witness. Moreover, the two doctors who made the certificates on which the defendant was committed in the instant case had testified on the trial that they had done so after a personal examination of the defendant, before causing him to be committed both for treatment and observation as to his mental status.

The district attorney had previously stated in his argument that ''Doctors all over the State of Mississippi sign these certificates without seeing the patient.'' This statement was objected to by defense counsel and the trial judge stated: ''Objection overruled. I think the doctor said that.'' It is to be assumed that the witness meant to concede that some doctors join in the making of the commitment certificates in reliance upon the examination made by another. This ruling of the court was made in the presence of the jury, but as we understand the record the objection to the statement of the district attorney hereinbefore first quoted — in regard to a letter having been sent out to the doctors — was raised by a motion for a mistrial after the jury had retired. It was then too late for the judge to have admonished the jury as to whether or not they should disregard such comment. Moreover, we do not think that this comment influenced the jury; they knew that the sheriff had caused the two doctors to see and examine the defendant in the instant case.

The fourth assignment of error to the effect that the court erred in overruling the motion of the defendant for a new trial relates back to the motion itself, which seems to have preserved the point that the verdict was

so contrary to the evidence as to enable us to consider whether or not if the defendant was not entitled to a directed verdict in his favor, he would be entitled to a reversal of the case on the ground that the verdict is against the great weight of the evidence.

The first witness, Esther Hill, was not questioned as to the mental condition of the defendant at the time of the shooting, or at any other time. She merely testified that after he had shot and killed his wife, Catherine Kearney, he then shot her, the witness; that she was living in the home of the defendant and his wife and that she and he had never had a cross word or quarrel, and that she didn't know why he shot her.

The next witness, Curtis Reed, who was with one Sam Echols in a room through which the defendant passed immediately before the shooting, said that he was sitting down on a table and that the defendant told him "take your leg down" off the table and that Sam Echols also told him to do so; that the witness said to the defendant, "You don't look like you feel so good," and that the defendant replied, "No, I don't. I will be back in a few minutes." Curtis Reed didn't see the shooting which occurred when the defendant went on into the front room.

The next witness, Sam Echols, testified that "Henry Bell came out of the back room. The gun was in his front pocket and he told Curtis Reed to get off the table. Curtis said 'I ain't.' He said 'Yes, get off, that's where they serve to eat.' I spoke to Curtis and said 'get down, Curtis, you know it ain't right to sit on the table.' * * * He (the defendant) walked out and Curtis said to me 'something is wrong, he ain't right, for some cause.' I raised over and looked at him as he left out. He goes (in the store) around the meat block. His wife was behind the counter near the front up there with some little tickets in her hand at the adding machine. Henry Bell said 'O. K. Catherine, I been telling you this a long time,' and started shooting. Esther, she was down —

there was a step-down place — and he shot Esther." This witness further testified that he asked: "Henry Bell, what did you shoot your wife for? * * * ," and that the defendant then said "that sonofabitch, she won't mistreat me any more. Call the law"; that the witness then said to the defendant, "you call them"; and that the defendant "got the phone and called Mr. Kimbro (the sheriff)"; that the defendant dialed the telephone himself, and that thereafter "Henry Bell was just walking back and forth through his place," meaning the place where he and his wife operated a little grocery store in the front room. The witness, Echols, was later asked on cross-examination: "Q. He didn't look like he was normal? A. No, sir, he really didn't * * * Q. Did Henry Bell look to you like he might have been out of his mind that night? A. He looked strange, yes, sir, all right enough. Q. Do you think he could not have known what he was doing that night? A. Well, sir, I don't know, sir." The witness then admitted that he didn't know whether the defendant merely called the operator or dialed the sheriff's telephone number, which was shown to have consisted of four figures.

The sheriff then testified for the State that when he arrived at the scene of the shooting, he asked the defendant, "What's the trouble, * * * "; and that the defendant just pointed to his wife whose body was lying on the floor, and "kind of grinned." The sheriff was asked whether he knew of any previous altercations between the defendant and his wife, and he replied: "The defendant and his wife both had a bad reputation with my office and the police officers of the town." He further testified that the defendant was taking a drink of whiskey when he (the sheriff) went in the place of business and that "he looked like he was in a dazed condition" and that he was later just sitting in a chair rocking back and forth "like the Fifth Vice-President of the First National Bank, or something."

The sheriff was then asked: "Why did you have him examined by Dr. Gilmore? A. I thought it was the right thing to do. * * * " It appears that the defendant had been asleep on the bed in the back room immediately before going through the middle room where Reed and Echols were, and that he had not had a drink of whiskey except the one that he was taking at the time the sheriff arrived in the store in the front room. The sheriff also testified that the defendant knew him and knew Mr. Brown, who accompanied the sheriff to the store, when they arrived at the scene. He was asked, "Q. The night of the shooting at the store, do you think he knew where he was. A. I am sure he did. Q. Do you think he knew what he was doing. A. I wasn't there, when he killed her, but I believe he did * * * Q. And you cannot know for sure he was able to distinguish right from wrong, from your observation of him at that time? A. No, sir, I couldn't say."

The last witness offered by the State in chief was Bessie Hill, a sister of the deceased Catherine Kearney, and she testified that when she arrived at the scene the defendant "told me that he had taken care of her. I asked him what he meant. He said 'I mean I done killed her.' I said 'where is she at?' He said 'there she lays over there.'" This witness further testified that the defendant was in the bed when she left to go to town shortly before the shooting, and that if he had been drinking, she didn't know it. She was finally asked: "Q. You can't say whether he was sane or insane at the time of the shooting? A. I don't know, sir." But she said "he was acting just like he always acted."

The defendant then introduced Dr. Phelps, who was summoned to the scene immediately after the shooting about 10 o'clock of October 9, 1953. He did not examine the defendant, but observed him sitting in a chair and said that "his appearance was one of a very placid individual, sitting very much as he is now"; that the witness was unable to give an "accurate opinion on his mental ca-

pacity or mental condition  *  *  *  He didn't act to me as a man who had just killed someone. He was very collected and not upset in the least; at least, he didn't seem to be.'' Dr. Phelps further stated that ''From past experience, I think Henry Bell is what we would say 'a little off'  *  *  *  You might say he does not think coherently. He sometimes acts a little strange — forgets events and seems to be out of contact with reality at times.  *  *  *  Q. In your opinion, on the night when you did observe him, would you say that he had the capacity to distinguish right from wrong. A. I couldn't answer that; I don't know.''

The next witness for the defense was Dr. Gilmore who examined the defendant within an hour after the shooting, and he testified ''He had a more or less glazed look in his eyes; didn't seem to be conscious of what was going on at the time  *  *  *  Q. Would you say at the time of your examination, he was mentally deranged? A. Yes, sir, I would.'' This witness further testified in regard to an examination given the defendant by him and Dr. Brevard on October 16, 1953, when they determined that he was in a paranoiac state and that he should be committed to Whitfield. ''Q. And when you examined the defendant on October 9th, your testimony is that he was mentally deranged at that time. A. That's correct. Q. And again, on October 16th, you were of the same opinion? A. Yes.''

Dr. Brevard testified that he had examined the defendant on three different occasions, one of which was October 16, 1953, before joining Dr. Gilmore in making the certificates whereby he was committed to Whitfield and says that on that occasion ''He was very confused. He didn't give answers to my questions very clearly — wandering statements. He was not very coherent, I would say, was his condition. Q. Did he seem to know where he was? A. I don't believe he did, no sir. Q. In your opinion, was he mentally deranged? A. Yes, sir.  *  *  *  Q. To what did you attribute his mental

derangement? A. It was paranoia, a mentally progressive disease." When questioned as to whether the defendant knew the difference between right and wrong this doctor said: "Q. Did you think at the time you examined him he had the capacity to distinguish right from wrong? Would you be able to say he did, or did not? A. I can't tell whether a man knows right from wrong, or not, but I would say he did not know right from wrong. Court: What was your answer to that question? A. I said I couldn't say whether a man knew the difference between right or wrong, or not. I would say that he didn't. Q. You would say that he did not? Is that your answer? A. Yes, sir."

The defendant testified in his own behalf and stated that the only thing that he could remember was that he was "standing there in the store and she told me to get out and said 'you can't stay here no more.' I went on in the room and laid down across the bed and she come in there and said 'you ain't going to stay here if it is your bed,' and grabbed me by the leg and snatched me out of the bed. That's all I can remember." Neither Reed nor Echols testified whether they were present in the middle room at the time of the occurrence in the back room above mentioned. The defendant denied any recollection of having seen Curtis Reed and Sam Echols in the middle room of the building or remembering anything else that happened on the occasion of the shooting.

Three witnesses testified as to the good reputation of the defendant for peace or violence, but the State introduced rebuttal witnesses to the contrary.

Thus it will be seen that in view of the testimony on behalf of the State in regard to the defendant having had sufficient presence of mind to know that the shooting should be reported to the officers, and to dial the telephone in calling the sheriff's home and having him summoned to the scene of the shooting, together with the statements which he is alleged to have made to his wife immediately before the shooting, and the statement

made to her sister as to what he had done, when compared with the testimony of the three local physicians and of the defendant himself, the precise question for decision is whether or not the jury was justified in finding that the State had met the burden of proof of showing that the defendant was possessed of sufficient mental capacity as to know right from wrong at the time of the shooting.

In the case of Waycaster v. State, 185 Miss. 25, 187 So. 205, the Court said: "The trial commenced with the presumption that Waycaster was sane. If nothing in the testimony, either on behalf of the State or the defendant, had suggested otherwise, there would have been no obligation on the State to establish his sanity. However, when such testimony as that hereinbefore mentioned was offered either by the state or the defendant sufficient to suggest a reasonable probability to the mind of any juror that he may not have been sane at the time of the killing, or to raise a reasonable doubt in regard thereto, the state was then required to establish the fact of sanity independently of the presumption in that behalf * * * The rule to be followed under our own jurisprudence is that announced by this court in the case of Cunningham v. State, 56 Miss. 269, 21 Sm. Rep. 360, where it was said: 'We think the true rule is this: Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case.' * * * "

It is to be noted that neither Dr. Phelps nor Gilmore testified affirmatively that in their opinion the defendant did not know the difference between right and wrong at the time of the shooting. Moreover, the foregoing

quoted testimony of Dr. Brevard shows that he first said, ''I can't tell whether a man knows right from wrong or not, but I would say that he didn't know right from wrong;'' and that thereupon, in response to a question by the court, he finally stated that while he didn't know whether the defendant knew right from wrong or not, ''I would say that he didn't.''

On the other hand, while it is true that aside from the statement of the sheriff that he believed that the defendant knew what he was doing that night, no witness for the State would express an affirmative opinion on the issue of whether the defendant knew right from wrong on the occasion of the shooting. However, they did relate facts and circumstances which occurred at or about the time of the shooting that would amply warrant a jury in finding that the defendant was angry with his wife and that he shot her pursuant to a premeditated design with the conscious intent to kill and murder her, and then shot Esther Hill, an eyewitness.

██ ██ We have carefully considered all of the evidence, and while the case is not without difficulty on the question of the weight of the evidence as to the mental condition of the defendant, we have concluded that this issue was one peculiarly for the determination of the jury. We are unable to say that the verdict was against the overwhelming weight of the evidence on that issue.

The judgment and sentence appealed from must therefore be affirmed.

Affirmed.

*Lee, Arrington, Ethridge,* and *Gillespie, JJ.,* concur.