362 So.2d 198 (1978)
Frankie Lee LIAS
v.
STATE of Mississippi.
No. 50444.
Supreme Court of Mississippi.
August 23, 1978.
Rehearing Denied September 20, 1978.
*199 Banks & Nichols, Fred L. Banks, Jr., Jackson, for appellant.
A.F. Summer, Atty. Gen. by Henry T. Wingate, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, WALKER and COFER, JJ.
WALKER, Justice, for the Court:
This is an appeal from a conviction of murder after a jury trial in the Circuit Court of Jefferson County, Mississippi. Appellant was sentenced to life imprisonment.
The sole issue is whether the jury was justified in finding the defendant understood the nature and quality of the act he was doing and was able to distinguish between right and wrong at the time of the murders. The facts with regard to the occurrence of the murders are uncontradicted.
Sometime between the evening of February 17, 1974 and the early morning hours of February 18, 1974, Frankie Lee Lias shot and killed his wife, daughter, sister-in-law and brother-in-law.[1]
The only defense argued was that of insanity. This defense was predicated primarily on the testimony of a psychiatrist from the Mississippi State Hospital at Whitfield. He testified that in his opinion Lias suffered from paranoid schizophrenia and could not tell right from wrong at the time the crime was committed. Additionally, it was stipulated that another psychiatrist from Whitfield would testify to the same effect if called as a witness. Other testimony by lay persons indicated Lias professed to be deeply religious, had adopted the nickname Black Moses, and professed to be able to communicate with God. According to his brother and another relative, on the night of the crime, Lias stated "The Lord told me to come to him and bring all those around me."
The state presented no medical expert testimony on the issue of sanity, other than the statement by the medical doctor who had pronounced the victims dead, that a day or two after the crime he saw Lias in jail and Lias appeared "solemn and remorseful." There was however lay testimony and other documentary evidence. The three lay witnesses presented in the case were defendant's two brothers and a life-long acquaintance. All three testified both for the state and for defendant. William Lias testified that on the night of the crime, Frankie appeared at his trailer driving his mother-in-law's car. He stated that Frankie had a .22 rifle in his possession and when he asked for the rifle Frankie refused, stating that the rifle had blood stains on it and he had just "blooded Hairston with it."[2]
Martin Lias testified that when he arrived with the two deputy sheriffs who arrested Frankie, Frankie told the deputies he had already been to the sheriff's office to surrender but that the office was closed. He further testified that he had no trouble communicating with Frankie on the night of the occurrence, that he understood Frankie and vice versa.
Dolores Jean Brown testified that on the night in question William Lias came to her home to use the telephone because Frankie had had a disturbance with his in-laws. Later she testified that on the same night *200 Frankie told her "I've been into it with my neighbors, with my family, in-laws." He then told her he killed all except one, Francesca. Most significantly at that time, Frankie asked her to call the sheriff to come get him the next morning. Finally, like Martin Lias, she testified Frankie was able to carry on a regular conversation. When asked if he was fully coherent and fully capable of talking to her and understanding her conversation, her reply was, "Seemed to be."
Other witnesses corroborated that Frankie stated he had gone by the sheriff's office earlier to surrender. Deputy Stringer testified that Frankie told him how to get into one of the homes where the murders occurred, i.e., through the same window Frankie used. Sheriff Wallace who had known the defendant for six to ten years previously testified that on the night involved Frankie appeared normal except that he was slightly nervous.
The final significant document which was given by Frankie to the sheriff at the time of his arrest was a handwritten "confession." The document stated:
CONFESSION:
 February 17, 1974
 Sunday 2:01 p m
To Whom It May Concern:
Dear God,
I love you, and if I havn't [sic] been living a desent [sic] life, I expect to pay for my mistakes. Father I wanted to live a happy life and I also wanted to make people happy. And as I pass alone [sic] if I can cheer somebody with a word or a song then my living would not be in vain. Farther [sic] I know I've done wrong things in my life, some was to benifit [sic] me and some was to benifit [sic] others. Farther [sic] I've always asked and belived [sic] in you. Farther [sic] you've showed me my death many times. I believe what you showed me. Maybe I'm one of a kind but I can't feel sorry for anyone not even my self. I remember seeing my Mother's death a few times, but every time I cried as [sic] begged you to let it be me instead. Well it really doesn't matter now, it really doesn't matter what happens now, because I lived my life. I don't even live for the future I only live for the present. I don't have any friends, because they all have betrayed me but still I go on treating them like they are outstanding. Well when I have to meet my day I don't want a long funeral and if and who delivers the news, I don't want them to talk too long. Pleas [sic] don't give me flower [sic]. I don't want a flower. I don't want anyone to weep for me. Theres [sic] a verse I once heard, rejoyce [sic] to the income and joyce [sic] to the outgo. The world owe me nothing and I owe the world nothing. Theres [sic] only two peoples [sic] in this world that I know and believed [sic] love me besides God, and that My Mother and Farther [sic]. After them you've got no one else to love you. I have two brothers that I'll be joining real soon. Let my body rest in Rose Hill Cemitery [sic] beside by brothers. Please tell my mother, weep not for me, but for those that are around her. When I've done the best I can, and I can't do no more, I ask you God, Please, Please come and take me. Take me as I am, because I'm your servant. I'll like to go farther, I'll like to say something about my family. I loved them very much cared for all of them then Saturaday [sic] morning about 9:20, 2-16-74, my Wife Carol Eve told me that Kenyatta is not my daughter. That she's Dr.'s [sic] Reed baby. All that time after April 23rd she now tell me that. I wish Donna Carol, my little daughter grows up and live a different life from her mother. My mother Mrs. Lenora Lias asked me to let her adopt Donna, and now I'd like her to do that. I want my every body to be happy. Frankie Lee Lias.
St. Matthew 21:32
And Jesus stood still, and called them, and said, What Will ye that I shall do unto you?
St. Luke 12:8
Also I say unto you, whosoever shall confess me before men, him shall the son of Man also confess before the Angels of God.

*201 A-MEN.
God I still love you, but you'll Never forgive me.
We have stated on several occasions that expert opinions of psychiatrists are not conclusive upon the issue of insanity but rather insanity is a question to be resolved by the jury. Hollins v. State, 340 So.2d 438 (Miss. 1976); Pounders v. State, 335 So.2d 904 (Miss. 1976); Myrick v. State, 290 So.2d 259 (Miss. 1974); Jones v. State, 288 So.2d 833 (Miss. 1974); Blackwell v. State, 257 So.2d 855 (Miss. 1972); Smith v. State, 245 So.2d 583 (Miss. 1971); and Kearney v. State, 224 Miss. 1, 79 So.2d 468 (1955). See Williams v. State, 354 So.2d 266 (Miss. 1978). We do not retreat from that position.
On the other hand, in each case we have reviewed the record to determine if the state's evidence was sufficient to support a finding by the jury of sanity beyond a reasonable doubt, and have reversed the case where no such sufficiency existed. Holloway v. State, 312 So.2d 700 (Miss. 1975); Gambrell v. State, 238 Miss. 892, 120 So.2d 758 (1960).
The instant record presents a close question of fact with a psychiatrist testifying that in his opinion, the defendant was unable to distinguish right from wrong at the time of the crime. Balanced against this is testimony of laymen who knew the defendant both before and after the crime and had opportunity to personally observe him before and after the crime. While admitting the closeness of the factual determination, we also acknowledge that such determination is the purpose for which juries exist. We are unwilling on an appeal to overturn a jury determination unless such determination is unsupported by the facts.
Here, the state's theory of the case was that the murder was a planned, deliberate and purposeful slaughter based on a revenge motive. The handwritten confession alludes to the wife's infidelity and the defendant's awareness shortly before the crime that his baby daughter was not his but that of another man. The defendant's own actions and responses made on the night in question indicate an awareness of what he was doing and the wrongfulness of the act. He related to two witnesses that he had attempted to turn himself in to the sheriff but the office was closed. He asked another witness to call the sheriff "in the morning." Furthermore, the handwritten "confession" itself indicated a knowledge of wrongdoing in its conclusion, "God I still love you, but you'll never forgive me." William Lias, his own brother, stated that the defendant knew the meaning of sin. Further, shortly after the time of the crime he was aware that he had "blooded Hairston," and that the rifle he held was loaded and lethal.
As to the psychiatric testimony, it is conceded that the doctor's opinion that defendant was insane and could not tell right from wrong was clear and unequivocal. However, the jury also had before it the benefit of cross-examination of the doctor where he admitted that an attempt to "turn oneself in" is evidence of knowledge that the person has done something wrong. The state also put forth the theory that the insanity could have been induced by the incident rather than preexisting the crime, to which possibility the psychiatrist agreed. It was also noted in the presence of the jury that the psychiatric examination necessarily occurred after the crime had been committed.
Based upon these considerations, we are unable to say the jury's determination was arbitrary or against the overwhelming weight of the evidence. Particularly where, as here, the determination of sanity was expressly made in writing by the jury.[3]
For the stated reasons, the case is affirmed.
AFFIRMED.
*202 SMITH, P.J., ROBERTSON, P.J., SUGG, BROOM, LEE, BOWLING and COFER, JJ., concur.
PATTERSON, C.J., specially concurring.
PATTERSON, Chief Justice, specially concurring:
I concur in the result reached by the majority which is to say only that it is my opinion the appellant should be institutionalized for the protection of the public.
The evidence of the medical witnesses is overwhelming, indeed uncontradicted, that Lias was insane at the time he killed seven individuals.[1] These doctors also gave evidence, again uncontradicted, that Lias was incapable of distinguishing right from wrong at the time of the slayings (the McNaughton rule). From this evidence I am of the opinion the appellant was mentally incapable of forming a premeditated design (malice aforethought) to kill and therefore is not guilty of murder.
This is not to say, however, that he did not slay those named in the indictment because the record indisputably reveals that he did so albeit, in my opinion, without criminal intent. Under this circumstance I think the proper procedure for the protection of the public which I am convinced does not violate constitutional due process, is: In the event it is established in a criminal proceeding that an act of violence has been committed, dangerous to the public and likely to be repeated, which would have been a crime if committed by a sane person, and additionally, there is evidence of insanity, this is sufficient for judicial commitment to a mental institution for the welfare of the individual and for the protection of the public.
I am of this opinion because our present statutes and case law delineate no clear provision for a case of this category. A review of the jury instructions reveals this deficiency. The jury (1) could have found the defendant guilty of premeditated murder, (2) it could have found the defendant not guilty, (3) it could have found the defendant not guilty by reason of insanity but certify that he is dangerous because "still insane,"[2] or (4) it could have found the defendant not guilty because of insanity and certify that he has since been restored to reason.[3] These instructions, when considered with another which states in part, "Insane people cannot be criminally punished for what they do; and this is true, regardless of whether such mental condition is temporary or permanent," left the jury with no realistic alternative to a verdict other than murder.
This is so, in my opinion, because it is very unlikely that a jury by its verdict would return a multiple killer to the streets even though criminal intention to commit the act was absent. I would avoid the "murder" result which I believe contrary to the overwhelming weight of the evidence and the law, by the procedure suggested above so that a person found not guilty by reason of insanity, but who is presently restored to reason, could be confined to a mental institution for his welfare and for the protection of the public.
Although Lias was previously adjudged incompetent for trial, his reason has been restored by medication and his present ability for trial is not an issue. His condition is diagnosed as schizophrenia, paranoid type, in remission. The record discloses Lias suffers from residuals of schizophrenia with the potential to again become psychotic and moreover, is capable of further acts similar to those for which he was tried. Only daily medication abates such occurrence. This *203 contingency presents a dangerous situation to which society should not be exposed. In Holloway v. State, 312 So.2d 700 (Miss. 1975), we stated:
Like other cases of this nature the courts are confronted with the absolute necessity of protecting society from the acts of the dangerously insane. There is no ready or perfect answer to the question as to what should be done with these wretched and unfortunate people. Mississippi Code Annotated Section 99-13-7 (1972) is a reflection of a legislative effort to provide a formula to meet the requirements of such cases. It appears that the evidence in this case presents serious questions as to (1) whether Holloway was not guilty by reason of insanity on November 23, 1963, and if so, (2) whether he is, or is not, now dangerous to the community.
(312 So.2d at 702)
And compare Caffey v. State, 78 Miss. 645, 29 So. 396 (1901).
I am of the opinion the jury's verdict of murder, including a finding of sanity at the time of the slayings, was contrary to the overwhelming weight of the evidence. The evidence is clear, unequivocal and certain that Lias was insane at the time of the slayings. It is uncontradicted that he is now sane due to medication with the potential of a return to a psychotic state absent daily medication. I think this Court should commit the appellant to a mental institution for an indefinite period, commensurate with his dependence upon medication for his reason.
I am of the opinion this procedure does not violate due process because the appellant was afforded a fair trial in accord with his defense. Moreover, the evidence of the slayings, insanity at the time, and present sanity, is uncontradicted. The weighing of these facts for the protection of the public demands judicial commitment to a mental institution, in my opinion, whether the procedure be called civil or criminal. I do not understand either Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), or O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), to command the release of a person with propensities of this appellant. Each of these cases may be distinguished from the present.
A quote from the syllabus in Jackson, supra, is sufficient to distinguish the posture and issue of that case from this. It states:
Indiana's indefinite commitment of a criminal defendant solely on account of his lack of capacity to stand trial violates due process. Such a defendant cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain competency in the foreseeable future. If it is determined that he will not, the State must either institute civil proceedings applicable to indefinite commitment of those not charged with crime, or release the defendant. Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412, distinguished.
(406 U.S. at 716, 92 S.Ct. at 1847, 32 L.Ed.2d at 438.)
And, somewhat similarly, O'Connor, supra, condemned the incarceration of an incompetent and nondangerous individual over a protracted period of time for treatment. It held:
In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends... .
(422 U.S. at 576, 95 S.Ct. at 2494, 45 L.Ed.2d at 407.)
In my opinion these cases do not prohibit civil commitment of a dangerous person for the protection of the public.
The violent propensities of Lias are amply illustrated by his past acts which are presently moderated only by medication. Although I think he is without guilt of a crime and not subject to punishment, nevertheless, his dangerous propensities are such that he should be confined to a mental institution for the protection of the public.
With this modification I concur in the result reached by the majority.
NOTES
[1] The incident involved eight victims, seven dead, but the indictment in the instant case embraced only four.
[2] Hairston was the community where Frankie and his in-laws lived.
[3] the jury find the Defendant to have been sane at time of commission of the crime, and guilty as charged."
[1] The four designated in the indictment and others established by the record.
[2] Miss. Code Ann. § 99-13-7 (1972). When any person shall be indicted for an offense and acquitted on the ground of insanity the jury rendering the verdict shall state therein such ground and whether the accused have since been restored to his reason, and whether he be dangerous to the community. And if the jury certify that such person is still insane and dangerous the judge shall order him to be conveyed to and confined in one of the state asylums for the insane. (Emphasis added.)
[3] Miss. Code Ann. § 99-13-7 (1972). We note the underlined words of the statute above were not included in the instruction.